Joseph C. **SPENCER,** Appellant–Defendant,

v.

**STATE** of Indiana, Appellee–Plaintiff.

No. 89A04–9409–CR–347.

Court of Appeals of Indiana.

Jan. 18, 1996.

Keith A. Dilworth, Richmond, for Appellant.

Pamela Carter, Attorney General, Randi F. Elfenbaum, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Joseph C. Spencer (Spencer) appeals from his conviction of voluntary manslaughter, a Class B felony;[1] theft, a Class D felony;[2] and his adjudication as a habitual offender.[3]

We affirm.

---

1. IND.CODE 35–42–1–3 (1993).

2. I.C. 35–43–4–2(a) (1993).

3. I.C. 35–50–2–8 (1995 Supp.).

## ISSUES

Spencer presents the following three re-stated issues for our review:

1. Whether Spencer "caused" the death of the victim so as to support his conviction of voluntary manslaughter.

2. Whether the State presented sufficient evidence to support Spencer's conviction for theft.

3. Whether Spencer's underlying offenses were properly proved in order to support his habitual offender adjudication.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the verdict reveal that on June 5, 1993, Spencer and his wife Susan were drinking heavily at their residence. The victim Marlan Siders and Brenda Smith joined the Spencers at approximately 7 p.m. that evening, and the four drank together. Later, the four went to Siders's apartment and continued drinking.

While sitting in Siders's living room, a heated confrontation erupted between Siders and Spencer. Siders grabbed Susan, ripping her blouse in the process, and apparently made some lewd comments that Susan interpreted as a "pass." Spencer warned Siders to stop. Spencer struck Siders several times with his fists. The first blow hit Siders in the face, and Siders fell to the ground. As Siders tried to get on his feet, Spencer struck him again in the face. Siders was bleeding at this point, and prior to Spencer's third and final punch in the face, Siders was not moving.

Following the beating, Spencer, Susan and Brenda Smith were seen leaving the apartment complex in Siders's car. Siders's upstairs neighbor heard an argument and then heard noise he described as "ransacking" of the downstairs apartment. (R. 535). He then saw Spencer, Susan and Brenda making several trips from Siders's apartment to his car. The neighbor placed a call to 911. Shortly thereafter, Spencer, Susan and Brenda were stopped by the Richmond police.

Siders's jewelry box and wallet were found under the front passenger seat where Spencer was sitting.

Meanwhile, in response to the 911 call from Siders's neighbor, Officer John Retherford arrived at Siders's apartment. As the first officer to arrive on the scene, Officer Retherford found Siders lying on the couch making a "gurgling" sound. (R. 477). Siders had blood coming from his mouth, blood all over his face and head, and appeared swollen. There were blood spatters on the walls and furniture. Siders was non-responsive and gasping for air. Officer Retherford found the bedroom in disarray. The dresser drawers had been taken out and dumped and the mattress had been turned on its side.

Spencer was charged by amended information with one count of murder, one count of robbery and a habitual offender violation.[4] Following a trial, the jury found Spencer guilty of voluntary manslaughter as a lesser included offense of murder as charged; theft as a lesser included offense of robbery as charged; and found Spencer to be a habitual offender. Spencer appeals.

## DISCUSSION AND DECISION

### I. Intervening Cause

Spencer contends that he should have been convicted of either involuntary manslaughter or aggravated battery rather than voluntary manslaughter because an intervening cause was responsible for Siders's death.

Following hospitalization, Siders was placed on a life support system, and remained alive for seven days following the injuries which Spencer inflicted upon him. Due to the poor prognosis, Siders's family and physicians elected to remove him from artificial means of life support. Spencer argues that he cannot be held responsible for Siders's ultimate death because of this intervening cause. We disagree.

■ Spencer essentially challenges the sufficiency of the evidence to support his conviction of voluntary manslaughter. The

---

4. Spencer was originally charged with attempted murder, a Class A felony; robbery, a Class A felony; and aggravated battery, a Class B felony. Following the death of the victim, an amended information was filed charging Spencer with murder. A second amended information was later filed charging Spencer with murder and robbery.

appellate standard by which we review sufficiency of the evidence claims is well-settled. We will neither reweigh the evidence nor resolve questions of witness credibility, but will look only to the evidence most favorable to the judgment, along will all reasonable inferences to be drawn therefrom. *Green v. State* (1995), Ind.App., 650 N.E.2d 307, 309.

I.C. 35–42–1–3 provides as follows:

(a) A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter, a Class B felony. However, the offense is a Class A felony if it is committed by means of a deadly weapon.

(b) The existence of sudden heat is a mitigating factor that reduces what otherwise would be murder under section 1(1) of this chapter to voluntary manslaughter.

■ An intervening cause is an independent force that breaks the causal connection between the actions of the defendant and the injury. *Green*, 650 N.E.2d at 309. An individual who inflicts injury upon another is deemed by law to be guilty of homicide if the injury contributed mediately or immediately to the death of that other person. *Sims v. State* (1984), Ind., 466 N.E.2d 24, 25. In order for an intervening cause to break the chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold the defendant responsible for the actual result. *Sims*, 466 N.E.2d at 26 (where injury inflicted by defendant required surgery, the intervening cause of surgery was not extraordinary and it was therefore fair to hold defendant responsible for the victim's death); *accord Thomas v. State* (1982), Ind., 436 N.E.2d 1109 (defendant's murder conviction affirmed where victim died of heart attack following robbery and being handcuffed by robbers); *Pittman v. State* (1988), Ind., 528 N.E.2d 67 (defendant's homicide conviction affirmed where abdominal stab victim died of complications following exploratory surgery on abdomen); *Wilson v. State* (1989), Ind., 537 N.E.2d 1185 (physician's insertion of tubes into beating victim's throat and stomach was not an intervening cause sufficient to break the chain of criminal responsibility so as to excuse defendant from responsibility for victim's death); *Gibson v. State* (1987),

Ind., 515 N.E.2d 492 (defendant who beat child, necessitating brain surgery during which child contracted staph infection which killed her, was responsible for her death). In each of these cases, the reviewing court reasoned that the defendant had put in motion the series of events which ultimately ended in the victim's death and therefore contributed mediately or immediately to the death.

The pathologist who performed the autopsy of Siders's body opined that the cause of death was blunt force injuries to the head, neck and face. The post-mortem examination revealed that Siders suffered from a fractured hyoid bone in the throat. The pathologist testified at trial that in his experience there are only three ways a person can sustain this type of rare injury: strangulation; vehicular accidents; and where the victim is lying on the ground and attacker jumps up and down on the victim's neck. The pathologist further testified that the removal of life support was not the cause of Siders's death because Siders would have died even had the life support not been removed.

Siders's treating physician testified that Siders suffered from severe anoxic encephalopathy, which is a condition where the brain is not functioning adequately due to the lack of oxygen. Although Siders showed some signs of breathing and his heart continued to beat, the treating physician informed the family that notwithstanding the best medical efforts, continuing treatment of Siders was in all probability a futile exercise. The doctor further informed Siders's family that if life support was continued, the best that they could hope for was a "persistent vegetative state." (R. 767).

■ Based on the foregoing, we have no hesitation in concluding that Spencer's beating caused Siders's death and there was no intervening cause. The State presented sufficient evidence to prove each of the essential elements of voluntary manslaughter, as a lesser included offense of murder.

## II. Sufficiency of the Evidence

Spencer contends that the State failed to present sufficient evidence to support his

conviction of theft. Specifically, Spencer argues that the evidence reveals that Susan Spencer took a bottle of whiskey from Siders's apartment, and that Brenda Smith took her personal possessions from the apartment, but not that Spencer took anything.

As we noted above, the standard of review applied to sufficiency claims is well-settled. Without reweighing the evidence or judging the witness credibility, we look solely to the evidence most favorable to the verdict along with all inferences drawn therefrom. *Green*, 650 N.E.2d at 309.

The relevant portion of I.C. 35–43–4–2(a) provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class D felony." When Spencer, Brenda and Susan were stopped by police immediately following the beating, Brenda was driving Siders's car, Spencer was the front seat passenger, and Susan and her young child were in the back seat. Susan testified that after the police officers removed Brenda from the driver's seat of the car, Spencer was bending over doing something beneath his seat. Siders's jewelry box and wallet were removed from under Spencer's seat. Furthermore, Siders's upstairs neighbor testified that it sounded as if Siders's apartment was being ransacked. Upon arriving at the scene of the beating, Officer Retherford found the apartment in disarray with the contents of dresser drawers dumped and the mattress removed from the bed.

■ We conclude that the State presented sufficient evidence from which the jury could infer Spencer's guilt of theft beyond a reasonable doubt. *See Brewer v. State* (1995), Ind., 646 N.E.2d 1382, 1386 (A criminal conviction will be affirmed if there is evidence of probative value from which a reasonable jury could infer guilt beyond a reasonable doubt).

### III. Habitual Offender Adjudication

Next, Spencer contends that the State failed to prove the underlying offenses in support of the habitual offender violation and failed to sufficiently link those underlying offenses to Spencer. Specifically, Spencer argues that the trial court improperly admitted evidence of two prior Ohio felony convictions because the exhibits were not properly certified.

■ In order to sustain a finding that a defendant is a habitual offender, the State must prove that the defendant was guilty of two prior unrelated offenses, the second of which was committed after the defendant was convicted and sentenced upon the first charge. I.C. 35–50–2–8; *Roell v. State* (1995), Ind.App., 655 N.E.2d 599, 601.

Prior to trial, separate from the charging information, the State filed allegations of prior felony convictions as a basis for sentencing Spencer as a habitual offender. Specifically, the State alleged that Spencer had been convicted of two prior unrelated felonies in Vinton County, Ohio. During the habitual offender stage of Spencer's trial, Deputy Sheriff David Hickey from the Vinton County, Ohio Sheriff's Department testified regarding Spencer's two prior convictions. Deputy Sheriff Hickey testified that Spencer was an inmate at the Vinton County Jail from January of 1979 to June of 1979, following his conviction for aggravated assault. While Spencer was awaiting transfer to the State penal facility, he escaped from the Vinton County Jail. Shortly thereafter, he was recaptured. Hickey made a courtroom identification of Spencer, and because the population of the Vinton County Jail did not usually exceed ten inmates, Hickey clearly remembered Spencer. The following colloquy occurred between Hickey and the Prosecutor:

Q. But you know that this is the same Joe Spencer that escaped and was indicted for escape in Vinton County?

A. It's the same Joe Spencer, yes Sir.

The State then admitted State's Exhibits 1 and 2. State's Exhibit 1 consists of various documents from Vinton County concerning Spencer's 1979 conviction of aggravated assault. An indictment was returned by the grand jury of Vinton County on November 29, 1978, charging Spencer with aggravated assault. He subsequently pled guilty and received a suspended sentence and was placed on probation on June 26, 1979. These

records indicate that at the time Spencer was sentenced on the aggravated assault charge, he was in the Vinton County Jail serving a sentence on an unrelated misdemeanor charge. While incarcerated on this unrelated charge and after being sentenced on the aggravated assault charge, Spencer escaped from the Vinton County Jail.[5] After being apprehended, Spencer's probation was revoked and the suspended aggravated battery sentence was imposed. Spencer was sentenced to two to five years in the Ohio State Reformatory. State's Exhibit 2 consists of various documents concerning Spencer's 1980 conviction of escape. On October 17, 1979, the grand jury for Vinton County returned an indictment against Spencer for escape. Spencer pled guilty to the charge of escape. He was sentenced to 6 months to 5 years incarceration at the Ohio State Reformatory to be served consecutive to his misdemeanor sentence and concurrent with the aggravated assault sentence.

■ Ind.Trial Rule 44(A)(1) provides that documents which are properly certified by the court clerk with the seal of office are admissible to establish a defendant's prior record for habitual offender purposes. The official seal of the Court of Common Pleas, Vinton County, Ohio was affixed to the certificate and stapled to Exhibit 1 and Exhibit 2. Spencer did not object to the admission of these documents at trial, and therefore he has waived any error with regard to their admission. *Hackney v. State* (1995), Ind. App., 649 N.E.2d 690, 693, *trans. denied.* Notwithstanding waiver, we find no error, fundamental or otherwise.[6] The certification attached to Exhibit 1 attests that the documents are true and accurate copies from the court file of Case Number 6274, State of Ohio vs. Joe Spencer. The certification attached to Exhibit 2 attests that the documents are "true and correct" copies from the court file

of Case Number 6306, State of Ohio vs. Joe Spencer. (R. 907; 919). Although the actual language of the certificates appear to be copies, the separate cause numbers are typewritten and the deputy clerk's signature is written in pen and ink. We find the certification in this case to be adequate. *See Johnson v. State* (1993), Ind., 622 N.E.2d 172, *reh'g denied* (seal of the circuit court on documents purporting to establish habitual offender's two prior felony convictions were sufficient, although clerk's stamp merely stated that documents were certified copy of the court's record, not that they were "true and complete" copies of the records).

■ Based on the foregoing, the State proved beyond a reasonable doubt that Spencer had accumulated two prior unrelated felony convictions, the second of which was committed after his conviction and sentence on the first. Furthermore, the Ohio court records establishing the existence of these predicate offenses were properly admitted into evidence.

### CONCLUSION

In sum, there being no intervening cause, Spencer is responsible for the death of Siders; the evidence is sufficient to support Spencer's conviction of theft; and proof of Spencer's two unrelated felony convictions was presented pursuant to I.C. 35–50–2–8.

Accordingly, the trial court is affirmed.

CHEZEM and NAJAM, JJ., concur.

---

5. Spencer was sentenced on the aggravated battery charge on June 26, 1979, and escaped from the jail on June 28, 1979.

6. Spencer attempts to avoid the State's claim of waiver by asserting fundamental error. Fundamental error is a "substantial blatant violation of

basic principles rendering a trial unfair to the defendant, and which, if not corrected would deny the defendant fundamental due process." *Morgan v. State* (1995), Ind.App., 648 N.E.2d 1164, 1168.