**Iregous EWING, Appellant**
**(Defendant Below),**

v.

**STATE of Indiana, Appellee**
**(Plaintiff Below).**

No. 46S00–9804–CR–196.

Supreme Court of Indiana.

Nov. 19, 1999.

Donald W. Pagos, Michigan City, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy

Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Iregous Ewing was convicted of the robbery and felony murder of Donnie Hyatte. The trial court merged the convictions and sentenced Ewing to sixty-five years imprisonment for felony murder. In this direct appeal Ewing contends that (1) he cannot be convicted of murder because the victim died after being removed from a ventilator; (2) the trial court erred by admitting "gruesome" crime scene photographs and videotape; and (3) he was denied a fair and impartial jury because the pool of prospective jurors consisted exclusively of people over the age of fifty. We affirm the trial court.

### Factual and Procedural Background

On the morning of May 2, 1996, police were dispatched to the Michigan City gas station that Hyatte managed. Customers had reported that no one was at the register, the register drawer was open, and there was a large amount of blood on the floor. Police followed the trail of blood to a back room where they found Hyatte lying in a pool of blood with his arms in the air. Hyatte had been stabbed, his left femoral arteries had been severed, and he had lost almost one hundred percent of his blood by the time he arrived at the emergency room.

Hyatte's car was missing, and that information was submitted to the National Crime Information Center database. A few days later the vehicle was found in Chicago. Detectives from Michigan City went to Chicago to talk to the driver, LeCrista Ewing. LeCrista and her sister Melvina Freeman both identified their brother, Ewing, as the person in still pictures made from the videotape of the surveillance camera at the Michigan City gas station. The detectives then went to Ewing's mother's home where they secured her consent to a search. They found Ewing in the house, arrested him, and took him to the Chicago Police Department. When Ewing told the officers that he did not want to talk with them at that time, the detectives departed for Michigan City, but soon received word from Chicago police that Ewing had changed his mind. They returned to Chicago where Ewing, after being advised of and waiving his Miranda rights, gave a statement.

Ewing told the detectives that he had traveled to Michigan City to "secur[e] a guy while he [sold] drugs" in a housing project there. Ewing grew tired of waiting for a ride back to Chicago, so he left the project and "started walking." He soon found the gas station where Hyatte was working. Ewing observed that Hyatte was the only person inside the station and that a car was parked outside. After some customer traffic subsided, Ewing saw Hyatte counting money at the register, entered the store, pulled out a knife and demanded the money and keys to the car. When Hyatte refused, Ewing struck him with the knife, took the money and keys, and left.

Hyatte died eleven days later after being removed from a mechanical ventilator. Ewing was initially charged with robbery as a Class A felony but the charges were later amended to include a felony murder count. The forensic pathologist who performed the autopsy testified at trial that the cause of death was brain death. The jury convicted Ewing of both counts. The trial court merged the convictions and sentenced Ewing to sixty-five years for felony murder.

### I. Sufficiency of Evidence for Murder

Ewing contends that his felony murder conviction cannot stand because "the cause of death was the voluntary cessation of life support." The State offers two responses. First, the State argues that Hyatte was already dead before life support was withdrawn. Second, the State contends that withdrawal of support in these circumstances was not an intervening cause of death. After hearing all the evidence and being instructed on the applicable law, the

jury found Ewing guilty of felony murder. There is sufficient evidence to support its verdict on both theories.

██ Ewing's claim is essentially an attack on the sufficiency of the evidence, which is reviewed under well-settled principles. We do not reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Taylor v. State,* 681 N.E.2d 1105, 1110 (Ind.1997).

██ As for the claim that Hyatte was alive at the point of withdrawal from life support, the jury was instructed on the definition of death that appears at Indiana Code § 1–1–4–3, which provides in relevant part:

(a) Only an individual who has sustained either:

(1) irreversible cessation of circulatory and respiratory functions; or

(2) irreversible cessation of all functions of the entire brain, including the brain stem;

is dead. A determination of death must be made in accordance with accepted medical standards.

Dr. Rade Pejic, a surgeon, testified that he treated Hyatte shortly after his arrival in the emergency room. Hyatte had sustained a major laceration of the left femoral arteries which caused "a massive amount of blood loss. As a matter of fact, he was in full cardiac arrest...." He testified that Hyatte was "being coded for more than a half an hour, maybe forty-five minutes in the ER before they took him to surgery." Hyatte received approximately twenty pints of blood—approximately three times the normal blood volume for an individual his size—while in the emergency room. Hyatte then spent two or two and a half hours in surgery during which Pejic repaired the wound and stopped the bleeding. In the next few days Pejic ran two electroencephalograms that indicated "a very significant derangement of his brain cell ... function." Eleven days after Hyatte's admission to the hospital, Pejic performed an angiogram to determine if there was any blood flow to the brain. He concluded that Hyatte "had no blood flow to his brain whatsoever which told everybody that he had irreversible brain death since he had no blood supply to his brain for approximately eleven days." He observed that "[w]e gave his body basically every possible—medical surgical opportunity to see if there is any possible hope of him coming back to life in lay terms, and after numerous consultations with the neurologist, the neurosurgeons, the medical doctors, it was obvious that this patient was, in lay sense, brain dead."

Dr. Dean Hawley, a forensic pathologist, performed an autopsy on Hyatte and also testified at trial. He opined that by the time the openings in the arteries were repaired in surgery, Hyatte's "brain had already died from lack of blood flow as a consequence of hemorrhagic shock.... Following hemorrhagic shock, his brain was lost, but his heart and lungs remained viable on life support...." His brain then began to degenerate to "an almost completely liquified state." Hawley testified that Hyatte died as the result of "anoxic encephalopathy, which is brain death, due to a stab wound to his left groin." When asked to explain anoxic encephalopathy, he offered the following summary:

Mr. Hyatte was stabbed. At the time of his stabbing, he began to bleed profusely. He was bleeding so much that his heart was not able to pump a vital supply of oxygen to his brain and his brain died. At that point, he was stabilized from bleeding and his heart and lungs were resuscitated. He was placed on mechanical ventilation in a true dead state. In other words, in Indiana there is a legal definition for death and that legal definition includes brain death. He was maintained dead on a ventilator

with life support for a period of several days and then life support was discontinued....

Based on the testimony of Drs. Pejic and Hawley, the jury had ample evidence to conclude that Hyatte was brain dead at the time the ventilator was disconnected.

The same evidence supports the conclusion that withdrawal was not an intervening cause of death, even if some minimal brain function remained. "[I]t is the rule of homicide law that a defendant is responsible for the death of the decedent if the injuries inflicted contribute either mediately or immediately to the death." *Swafford v. State*, 421 N.E.2d 596, 602 (Ind.1981). "In order for an intervening cause to break the chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold the appellant responsible for the actual result." *Sims v. State*, 466 N.E.2d 24, 26 (Ind.1984).

Ewing concedes in his reply brief that recent Court of Appeals' opinions hold that the removal of life support is not an intervening cause that breaks the connection between the defendant's actions and the victim's death. *See, e.g., Spencer v. State*, 660 N.E.2d 359, 360–61 (Ind.Ct.App.1996). However, he argues that these cases are "bad law as they stand for the proposition that an unfettered decision to euthanize can lead to a murder conviction." He contends that a defendant should not be subject to a murder charge when a victim wants to end his or her life because of impairment of a bodily function or when life support is removed because the victim's insurance ran out. That may be true, but neither of these circumstances is present here. Where life support is removed because, as here, Hyatte had suffered irreversible cessation of all functions of his entire brain, *see* Ind.Code § 1–1–4–3(a), the removal of life support is not an intervening cause that relieves the killer from the inexorable consequences of his or her actions. There is sufficient evidence to support the felony murder conviction.

## II. Gruesome Photographs

■ Ewing contends that the trial court erred in admitting several "gruesome" crime scene photographs. These photographs depicted the trail of blood between the cash register and the back room where Hyatte was found. The photographs do not depict Hyatte and the wounds he suffered, but rather show the scene as a detective found it shortly after the stabbing. Ewing also objected to the admission of a videotape of the crime scene that similarly depicted the blood trail.

■ We review the admission of photographic evidence for an abuse of discretion. *See Humphrey v. State*, 680 N.E.2d 836, 842 (Ind.1997). Photographs depicting matters that a witness describes in testimony are generally admissible, and photographs depicting the crime scene are admissible as long as they are relevant and competent aids to the jury. *See Woods v. State*, 677 N.E.2d 499, 504 (Ind.1997). The fact that a photograph or videotape may depict gruesome details of a crime is not a sufficient basis for exclusion. *See Isaacs v. State*, 659 N.E.2d 1036, 1043 (Ind.1995). Rather, to constitute error the probative value of the photograph must be "substantially outweighed by the danger of unfair prejudice...." Ind. Evidence Rule 403; *Bufkin v. State*, 700 N.E.2d 1147, 1149 (Ind.1998).

The photographs and videotape here accurately depicted the crime scene. Although the large amount of blood was arguably graphic, it was certainly less so than the typical "gruesome" photograph that shows wounds to the victim's body. These exhibits offered probative value by depicting the crime scene and showing the large amount of blood loss. Because this probative value was not substantially outweighed by the danger of unfair prejudice, the trial court did not abuse its discretion by admitting these exhibits.

## III. Fair Cross–Section of Jury Venire

■ As a final point Ewing contends the jury selection process systematically ex-

cluded persons under the age of fifty. Because none of the forty-seven prospective jurors who comprised the panel from which his jury was selected were under the age of fifty,[1] Ewing moved to strike the entire jury panel. In overruling Ewing's motion the trial court observed that "[t]he panel is selected from registered voters. There have been situations where we have had just the opposite, where we have a lot of young persons and no older people, so I don't know, it's a random selection."

 In order to make a prima facie showing of a violation of the Sixth Amendment's fair cross-section requirement, a defendant must establish:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979). As a threshold matter we must address whether persons aged eighteen to fifty are a "distinctive" group in the community. Ewing cites no authority for the proposition that people within a certain age range are a "distinctive" group for purposes of the fair cross-section requirement. This Court has explicitly rejected the contention that persons between eighteen and twenty four years old are a distinctive group under *Duren.* See *Thomas v. State,* 443 N.E.2d 1197, 1199 (Ind.1983); *Tawney v. State,* 439 N.E.2d 582, 585 (Ind.1982); *Grassmyer v. State,* 429 N.E.2d 248, 251 (Ind. 1981).

We observed in *Grassmyer* that there was no showing that this age group is "a group distinct from the rest of society in a significant way, having interests which

cannot be adequately represented by other members of the trial panel. Regarding the claim that the group is distinctive in the economic sense, there is likewise no showing." 429 N.E.2d at 251; see also *Moore v. State,* 427 N.E.2d 1135, 1139 (Ind.Ct.App.1982) (finding "no showing whatever that the alleged group of 18 to 24 year olds possesses the common thread necessary so that their relative exclusion prevented the jury from the opportunity to represent a reasonable cross section of the community"). Courts in other jurisdictions agree. As the Seventh Circuit recently observed, every federal circuit that has considered the issue has concluded that "young persons" do not constitute a distinctive group under *Duren. See Johnson v. McCaughtry,* 92 F.3d 585, 593 (7th Cir.1996) (collecting cases).

Not only has Ewing failed to establish that eighteen to fifty year olds are a "distinctive" group, he has also made no showing of systematic exclusion. Although defense counsel suggested that "there is a problem of how the jury commissioners are gathering the prospective jurors and how they are making the quarterly panels," the trial court observed that the jurors were selected from registered voters lists and "we have had panels where the people between the ages of eighteen and forty-five were more prevalent than the older people, so I can't really say that what they are doing is improper." Ewing has not demonstrated a violation of the fair cross-section requirement.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON and SULLIVAN, JJ., concur.

---

1. Although Ewing contends that "not one [of the prospective jurors] was under the age of 55," a review of the record shows that several

jurors were under the age of fifty-five, and the youngest prospective juror was fifty-one.