Jerome **WILLIAMS**, Appellant–
Defendant,

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A02–0201–CR–96.

Court of Appeals of Indiana.

Feb. 7, 2003.

Mark Small, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

MATHIAS, Judge.

Jerome Williams ("Williams") was convicted of murder,[1] a felony, attempted robbery,[2] as a Class A felony, and carrying a handgun without a license,[3] as a Class A misdemeanor, after a jury trial in Marion Superior Court. Williams appeals raising five issues, which we restate as:

I. Whether the trial court abused its discretion when it allowed two witnesses to testify to what the victim told them in the emergency room after the shooting;

II. Whether the trial court abused its discretion when it allowed the medical examiner to testify as to why some of the victim's organs were not harvested;

III. Whether the trial court abused its discretion by reading the jury Final Instruction 10D, which referred to accomplice liability;

IV. Whether there was sufficient evidence to support Williams's conviction for murder; and,

V. Whether Williams's sentence was inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

1. Ind.Code § 35–42–1–1(2) (1998).

2. Ind.Code § 35–42–5–1 (1998); Ind.Code § 35–41–5–1 (1998).

3. Ind.Code § 35–47–2–1 (1998).

## Facts and Procedural History

On December 17, 1999, Frank Townsend ("Townsend") was using his car to provide taxi services to earn extra money for the holidays. At approximately 11:00 p.m., Williams and his cousin, Cleve Williams ("Cleve"), left a friend's house and walked to a gas station. At the gas station, Williams used a payphone to call a cab. Both Williams and Cleve had handguns; Cleve had received one earlier that day from Williams. When Townsend arrived at the gas station, Williams sat in the front seat and Cleve sat in the back seat. Williams told Townsend to keep his hands on the steering wheel and drive. Tr. p. 278.

A few minutes later, the car stopped near the intersection of North Beville and Coyner. Williams's and Cleve's aunt lived across the street from that location. Almost immediately after the car stopped, shooting started from the front seat area of the car. Cleve then pulled out his gun and started shooting. When Cleve stopped shooting, he got out of the car through the back passenger's window and ran to his aunt's house. A few minutes after Cleve reached his aunt's house, Williams also entered his aunt's house and was bleeding. Cleve then left and went to his uncle's house.

Indianapolis Police Officer Brian Bethel ("Officer Bethel") was patrolling the area of Brookside Parkway in Indianapolis at around 11:00 p.m. Initially, when Officer Bethel drove through the intersection of Beville and Coyner, he did not observe anything unusual. When he drove though a few minutes later at 11:36 p.m., Officer Bethel saw a car sitting in the road facing northeast on Coyner. The headlights of the vehicle were on, the car was running, and there was glass broken out of the driver's side window. Officer Bethel stopped to investigate and observed a person slumped in the driver's seat. As he approached the car, Officer Bethel saw that several of the windows had been broken out, all of the car's doors were closed, and that the man, who was later identified as Townsend, in the driver's seat appeared to be unconscious. Townsend had blood on him, and a handgun was lying a few inches from his hand.

Officer Bethel moved the handgun for safety reasons and called in for backup. At that time, a woman came from 2214 Coyner and told Officer Bethel that there was another person shot inside the house. Tr. pp. 79–80. Another officer arrived at the scene and went with the woman to check on the person inside the house. Officer Bethel then returned to Townsend and noticed that he had stopped breathing. Officer Bethel pulled Townsend out of the car to assist him. The car began to move, so Officer Bethel quickly put the car in park. When Officer Bethel returned to Townsend, he was breathing again. The ambulance arrived shortly and took care of Townsend. Officer Bethel then went to the woman's house and saw Williams lying on the floor bleeding. Another ambulance arrived and took care of Williams.

Indianapolis Police Lieutenant Mark Rice ("Lieutenant Rice") arrived at Wishard Hospital at 11:52 p.m., in response to a call regarding two people who had been shot at Beville and Coyner. Lieutenant Rice first checked on Townsend, who was the most critically injured. Townsend was being treated by the emergency room personnel. He had an oxygen mask over his mouth and had chest tubes inserted in his chest. Lieutenant Rice asked Townsend what had happened, and Townsend told him that two young men had tried to rob him. Tr. p. 114. Townsend stated that one of the men had been in the front seat, and one had been in the back seat. *Id.* He told Lieutenant Rice that he knew that the

man in the front seat had shot him, and he was possibly shot by the man in the back seat. *Id.* The two men had also asked Townsend how much money he had. Tr. p. 115. Townsend stated that he had a gun under his right leg and had fired before the man in the front seat had. *Id.* Townsend told Lieutenant Rice that he had picked up the two men at 1105 Jefferson. *Id.*

Lucille Townsend ("Lucille"), Townsend's wife, also arrived at the hospital. Lucille was notified that Townsend was at the hospital at approximately 11:45 p.m. and reached the hospital about thirty minutes after receiving the notification. When Lucille saw her husband, he was on a gurney in the emergency room and was in a lot of pain. There was blood on the floor and the bed, and Townsend had tubes and IVs sticking out of his body. Townsend told Lucille that he had picked up two young men at 10th and Jefferson. Tr. p. 127. He stated that when the men entered the car they had their guns drawn, and they tried to rob him. *Id.* Townsend said that he had pulled out his own gun, but it had jammed when he fired it. *Id.*

On January 19, 2000, Townsend underwent major surgery, and his gallbladder was removed. For part of his hospitalization Townsend had a trach tube inserted to assist him with breathing. On March 4, 2000, Townsend was in pain and was disoriented. He had an elevated fever and high white blood cell count. On March 5, 2000, Townsend, while sitting in a chair, went into cardiac arrest when his trach tube became blocked by mucous. He did not recover from the lack of oxygen to his brain, and he was taken off of life support on March 8.

On March 31, 2000, Williams was charged with murder, a felony, attempted robbery, as a Class A felony, carrying a handgun without a license, as a Class A misdemeanor, and dangerous possession of a handgun, as a Class A misdemeanor. A jury trial was held on October 22–24, 2001, and the jury found Williams guilty of murder, attempted robbery, and carrying a handgun without a license. The trial court merged the attempted robbery and carrying a handgun without a license convictions into the murder conviction and sentenced Williams to sixty-five years in the Department of Correction. Williams now appeals. Additional facts will be provided as necessary.

## I. Admission of Statements

The admission of evidence is within the sound discretion of the trial court, and the decision whether to admit evidence will not be reversed absent a showing of manifest abuse of discretion by the trial court resulting in the denial of a fair trial. *Prewitt v. State,* 761 N.E.2d 862, 869 (Ind.Ct.App.2002). A decision would be an abuse of discretion if it is clearly against the logic and effect of the facts and circumstances before the court. *Id.* In reviewing the decision, we only consider the evidence in favor of the trial court's ruling and any unrefuted evidence in the defendant's favor. *Id.*

### A. Townsend's Statements

Hearsay is an out of court statement offered to prove the truth of the facts asserted in the statement itself. Ind. Evidence Rule 801(c). Hearsay is generally inadmissible unless the statement falls within one of the established hearsay exceptions. Ind. Evid. R. 802. In the present case, the trial court admitted Townsend's statements to Lieutenant Rice and Lucille under the excited utterance exception.

For a hearsay statement to be admitted as an excited utterance under Evidence Rule 803(2), three elements must

be shown: (1) a startling event occurs; (2) a statement was made by a declarant while under the stress of excitement caused by the event; and (3) the statement relates to the event. Ind. Evid. R. 803(2). Application of these elements is not mechanical. Rather, the inquiry turns on whether the statement is inherently reliable because the declarant was under the stress of the event and unlikely to make deliberate falsifications. *Cox v. State,* 774 N.E.2d 1025, 1027 (Ind.Ct.App.2002) (citing *Jenkins v. State,* 725 N.E.2d 66, 68 (Ind.2000)). The time period between the startling event and the statement is but one factor to consider when determining if a statement is an excited utterance, but no precise length of time is required. *Id.* (citing *Simmons v. State,* 760 N.E.2d 1154, 1161 (Ind.Ct.App.2002)).

Williams argues that the trial court abused its discretion when it allowed Lieutenant Rice and Lucille to testify to statements that Townsend made after the shooting. He contends that the statements were not inherently reliable because Townsend could have fabricated these statements in the time that elapsed between the shooting and when he made the statements.

Here, Townsend had been subjected to a startling event. Two men had attempted to rob him, and he had been shot several times. Townsend made the statements to Lieutenant Rice and Lucille while in the emergency room and still in pain from being shot. He made these statements while undergoing medical procedures to save his life and shortly after he was found unconscious at the scene of the shooting. Townsend's statements also related to the attempted robbery and shooting.

■ Although some time had elapsed between the shooting and when Townsend made the statements, the amount of time that has passed is not dispositive. *Yamobi*

*v. State,* 672 N.E.2d 1344, 1346 (Ind.1996). We look instead to whether the statement is inherently reliable. Here, Townsend's statements were made in the emergency room after he was shot multiple times and while he had chest tubes and IVs in his body. Even though some time had passed since he was shot, his statements are inherently reliable because Townsend was still under the stress of excitement resulting from the startling event of being shot when he made the statements to Lieutenant Rice and Lucille. "Being shot is a traumatic event, both physically and psychologically. Its startling effect, depending on the severity of the injury, can continue for hours or longer." *Id.* at 1347.

■ Williams also states that we must consider whether the statements were made in response to an inquiry. "A declaration does not lack spontaneity simply because it was an answer to a question. Whether given in response to a question or not, the statement must be unrehearsed and made while still under the stress of excitement from the startling event." *Id.* at 1346. Thus, just because Townsend's statements may have been in response to questions by Lieutenant Rice and Lucille, this does not mean that the statements are not inherently reliable. Because the statements were made while Townsend was still under the stress of excitement of being shot, they are excited utterances, and the trial court did not abuse its discretion when it admitted them.

### B. Medical Examiner's Statements

■ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ind. Evid. R. 401. Generally, all relevant evidence is admissible, except as provided by law. Ind. Evid. R.

402. Evidence that is not relevant is not admissible. *Id.* However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evid. R. 403.

Williams argues that the trial court abused its discretion when it allowed statements by the medical examiner as to why some of Townsend's organs could not be harvested. He claims that the reasons why some of Townsend's organs could not be harvested are not relevant because cause of death is not an element of the offense of murder.

▇ The cause of death is not an element of the offense of murder itself, but becomes a relevant matter when an intervening cause of death is suggested. *See Wilson v. State*, 432 N.E.2d 30, 33 (Ind. 1982). Although cause of death may not be an element of the offense of murder, Williams claimed at trial that the cause of Townsend's death was not due to the shooting by Williams, but was instead, due to an intervening cause. The State used the statements of the medical examiner to show the extent of damage that the bullets caused to Townsend's organs. Because Williams suggested that Townsend's death was due to an intervening cause, the cause of death became a relevant matter in the trial, and the statements by the medical examiner as to why some of Townsend's organs were not able to be harvested was relevant.

▇ Williams also contends that the trial court abused its discretion because the probative value of the statements by the medical examiner was outweighed by unfair prejudice. The balancing test of Indiana Evidence Rule 403 requires the opponent of evidence to show that the risk of unfair prejudice substantially outweighs the probative value of the evidence. Ind. Evid. R. 403. "The evaluation of whether the probative value of a particular item of evidence is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court." *Bostick v. State*, 773 N.E.2d 266, 271 (Ind.2002). Because Williams suggested there was an intervening cause of death, the extent of damage that the bullets had done to Townsend's organs and body was extremely relevant to prove the offense of murder, and the risk that the jury would be inflamed by testimony of the damage to the organs was low. The trial court therefore did not abuse its discretion by allowing the medical examiner's statements.

▇ Although the trial court did not abuse its discretion, even if it had, the admission of the medical examiner's statements would have been harmless error. "An error in the admission of evidence is not prejudicial if the evidence is merely cumulative of other evidence in the record." *Pavey v. State*, 764 N.E.2d 692, 703 (Ind.Ct.App.2002), *trans. denied.* In this case, prior to the medical examiner's testimony, Lucille had also testified as to why some of Townsend's organs were not harvested. Because the medical examiner's statements were merely cumulative to Lucille's testimony, they were not prejudicial, and their admission was harmless.

## II. Jury Instruction

▇ Jury instructions are solely in the discretion of the trial court and will be reversed only if the trial court abuses that discretion. *Walker v. State*, 769 N.E.2d 1162, 1168 (Ind.Ct.App.2002), *trans. denied.* Jury instructions inform the jury of the law applicable to the facts of the particular case. *Id.* The instructions can be found erroneous if they misstate the law or otherwise mislead the jury. *Id.* On appeal, we presume that the jury followed the

instructions tendered by the trial court. *Id.*

Williams argues that the trial court abused its discretion when it gave Final Instruction Number 10D to the jury. Final Instruction 10D stated:

A person engaged in the commission of an unlawful act is criminally liable for probable and natural consequences of their common plan, including acts committed by one's confederate.

Appellant's App. p. 172. Specifically, Williams contends that the language within the instruction creates a mandatory presumption, which shifts the burden of proof to him.

In *Walker v. State,* a similar instruction was challenged as creating a mandatory presumption. 769 N.E.2d 1162, 1168 (Ind. Ct.App.2002). The challenged instruction stated:

It is a *fundamental principle* of law that . . . each person *is* criminally responsible for the actions of each other person which were a probable and natural consequence of their common plan even though not intended as part of the original plan.

*Id.* (emphasis in original).

In *Walker,* this court held that a reasonable juror could have understood the instruction to be a mandatory presumption that shifted the burden of proving the intent to commit the crimes to the defendant. *Id.* at 1170. The phrase "fundamental principle" was found to create a presumption because "it is clear that whatever concept [it] . . . denotes or describes must be of such importance that a reasonable person could assume its status as such." *Id.* The presumption was mandatory because the use of the word "is" indicated a mandate for the jury to presume the defendant's intent, and the jurors were not told they had a choice. *Id.*

In our case, Final Instruction 10D could reasonably be understood to create a mandatory presumption because the use of the word "is" indicates a mandate for the jury to presume the defendant's intent. *Walker,* 769 N.E.2d at 1170. Although this may be true, " 'the potentially offending words must be considered in the context of the [instructions] as a whole. Other instructions might explain the particular infirm language to the extent that a reasonable juror could not have considered the [instruction] to have created an unconstitutional presumption.' " *Id.* at 1168 (quoting *Francis v. Franklin,* 471 U.S. 307, 315, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985)).

Here, the jury was also given Final Instruction 10C, which states:

A person is responsible for the actions of another person when, either before or during the commission of a crime, he knowingly aids, induces, or causes the other person to commit a crime, even if the other person:

1. Has not been prosecuted for the offense[;]

2. Has not been convicted of the offense; or

3. Has been acquitted of the offense.

To aid is to knowingly support, help, or assist in the commission of a crime.

In order to be held responsible for the actions of another, he need only have knowledge that he is helping in the commission of the charged crime. He does not have to personally participate in the crime nor does he have to be present when the crime is committed.

Proof of the defendant's failure to oppose the commission of a crime, companionship with the person committing the offense, and conduct before and after the offense may be considered in determining whether aiding may be inferred.

Mere presence at the scene of an alleged crime or failure to oppose the crime is not, in [and] of itself, aiding[,] inducing or causing the commission of a crime. Neither is negative acquiescence sufficient standing alone. *There must be some conduct of an affirmative nature on the part of a defendant in order for that defendant to be criminally liable as an accessory. It must be proven beyond a reasonable doubt that a defendant had knowledge of and participated in the commission of the crime.*

Appellant's App. pp. 170–71 (emphasis added). The last two sentences of Final Instruction 10C state that some conduct of an affirmative nature is required in order for a defendant to be found criminally liable and that the defendant's participation in the crime must be proven beyond a reasonable doubt. These two sentences explain the language of Final Instruction 10D and allow a reasonable juror to not have considered 10D to create a mandatory presumption. *Walker*, 769 N.E.2d at 1168. They advise the jury that they do not have to presume Williams's intent for his confederate's crimes just because he was present. Final Instruction 10C requires that there must have been some sort of affirmative conduct, proven beyond a reasonable doubt, in order for the jury to find Williams guilty.

Williams argues that because in *Walker* a similar instruction was found not to be curative, Final Instruction 10C cannot be viewed to cure the language in 10D. But the instruction at issue in *Walker* did not state that it must be proven beyond a reasonable doubt that the defendant had knowledge of the crime and participated by some affirmative conduct. Instructions 10C and D, when read together, require that intent to participate must be proven. Therefore, the trial court did not abuse its

discretion when it read Final Instruction 10D to the jury.

### III. Insufficient Evidence

■■■■ Our standard of review for sufficiency claims is well-settled. We do not reweigh the evidence or judge the credibility of the witnesses. *Cox v. State*, 774 N.E.2d 1025, 1029 (Ind.Ct.App.2002). We only consider the evidence most favorable to the verdict and the reasonable inferences that can be drawn therefrom. *Id.* Where there is substantial evidence of probative value to support the judgment, it will not be disturbed. *Armour v. State*, 762 N.E.2d 208, 215 (Ind.Ct.App.2002), *trans. denied.*

■■■■ Williams argues that there was insufficient evidence to support his conviction for murder because there was ample evidence presented that Townsend's death was caused by the intervening cause of medical malpractice. Williams contends that because no one was present in Townsend's room when his trach tube became plugged and because there was no indication that any of the hospital staff saw a call light from Townsend's room the intervening cause of medical malpractice actually caused Townsend's death. "An intervening cause is an independent force that breaks the causal connection between the actions of the defendant and the injury." *Wooley v. State*, 716 N.E.2d 919, 928 (Ind. 1999). Usually, a defendant is responsible for the death of the decedent if the injuries inflicted contributed either mediately or immediately to the death. *Ewing v. State*, 719 N.E.2d 1221, 1225 (Ind.1999). In order for an intervening cause to break the chain of criminal responsibility, it must be so extraordinary that it would be unfair to hold the defendant responsible for the actual result. *Id.*

In the present case, Townsend was shot multiple times by Williams and Cleve when they attempted to rob Townsend on De-

cember 17, 1999. Because of the injuries Townsend sustained, he was taken to the hospital, where he was treated and remained for several months until he died on March 8, 2000. The medical examiner testified to the fact that Townsend had been shot five times and to the extensive damage done to Townsend's body by the bullets. Tr. pp. 193, 204–19. The medical examiner also stated that the cause of Townsend's death had been multiple gunshot wounds. Tr. pp. 234–35.

As a result of the wounds he suffered, Townsend had trouble breathing, and a trach tube had to be inserted to assist his breathing. On March 5, 2000, Townsend developed a plug in his trach tube and was therefore deprived of oxygen for several minutes. Townsend never recovered from this lack of oxygen, and he was taken off of life support on March 8.

Had it not been for Williams shooting Townsend several times, Townsend would not have been in the hospital nor would he have needed the trach tube. Any problems that occurred with the trach tube were therefore the result of the hospitalization and treatment necessitated by the injuries inflicted when Williams shot Townsend, and the use of the trach tube was not extraordinary. *See Wilson v. State*, 537 N.E.2d 1185, 1187 (Ind.1989) (insertion of tubes into victim's body not an intervening cause because it was necessitated by the injury inflicted on victim by defendant); *Gibson v. State*, 515 N.E.2d 492, 496 (Ind.1987) (staph infection was a direct result of the surgery and hospitalization necessitated by the injuries inflicted by defendant on the victim).

Williams's expert witness testified that she believed that there had been a breach of the standard of nursing care because no one was monitoring Townsend when his trach tube became plugged and because no one responded if Townsend called for help. Tr. pp. 436–37. No testimony was given that Townsend had called for help or that he had used his call light and received no response. Because Williams caused Townsend's injuries, which necessitated the insertion of the trach tube that became plugged, the plugging of the trach tube was not extraordinary and did not constitute an intervening cause. Sufficient evidence was presented to support Williams's conviction for murder.

## IV. Inappropriate Sentence

 "Although a trial court may have acted within its lawful discretion in determining a sentence," *Buchanan v. State*, 767 N.E.2d 967, 972 (Ind.2002), Article 7, Section 6 of the Indiana Constitution authorizes independent appellate review and revision of a sentence imposed by the trial court. "This appellate authority is implemented through Indiana Appellate Rule 7(B), which provides: 'The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender.'" Ind.App. R. 7(b).[4] Sentences at the extremes of the lawful range are more often (but not always) clearly, plainly, and obviously inappropriate. *See Hildebrandt v. State*, 770 N.E.2d 355, 360 (Ind.Ct.App.2002), *trans. denied.* (citations omitted).

---

**4.** We note that on January 1, 2003, this court will review and revise a sentence according to this new standard. The rule sets forth the standard of review and is directed to the reviewing court. The review of the sentence is made as of the date the decision or opinion is handed down, and therefore, since our review has taken place as of January 1, 2003, we use the inappropriate standard.

■ That part of Indiana Appellate Rule 7(B) that refers to the "nature of the offense" speaks to the statutory presumptive sentence for the class of crimes to which the offense belongs. *See id.* at 361. The classifications of crimes and their presumptive sentences, enhancements, and reductions have been determined by the General Assembly as a matter of public policy.

■ The presumptive sentence is meant to be the starting point for the court's consideration of the appropriate sentence for the particular crime committed. *See Lander v. State,* 762 N.E.2d 1208, 1214–15 (Ind.2002); *Bustamante v. State,* 557 N.E.2d 1313, 1321 (Ind.1990). In this case, judgment was entered against Williams on one count of murder, a felony, which has a presumptive sentence of fifty-five years. Ind.Code § 35–50–2–3(a) (1998).

■ Under Indiana Appellate Rule 7(B), the "character of the offender" refers to the general sentencing considerations under Indiana Code section 35–38–1–7.1(a) and the balancing of aggravating and mitigating circumstances under Indiana Code section 35–38–1–7.1(b) and (c), as well as the other factors left to the trial court's discretion under section 35–38–1–7.1(d). *See Hildebrandt,* 770 N.E.2d at 361.

■ The trial court is not limited to considering only the factors and circumstances contained within the statute, but may also consider other aggravating and mitigating circumstances in determining the sentence. *See* Ind.Code § 35–38–1–7.1(d). Like the presumptive sentence, the mandatory factors, enumerated aggravating and mitigating circumstances, and trial court discretion have been determined by the General Assembly as matters of public policy. Trial courts must balance aggravating circumstances against any mitigating circumstances in order to determine the proper deviation from the presumptive sentence.

At the sentencing hearing, the trial court found one aggravating circumstance, Williams's lengthy history of juvenile criminal acts and his adult criminal history, and no mitigating circumstances. Williams was sentenced to the maximum of sixty-five years.

■ Williams contends that as to the aggravating circumstance of his criminal history, the trial court should have given some consideration that his adult conviction occurred when he was within the inmate population and that he was defending himself. "Criminal activity that occurs subsequent to the offense for which one is being sentenced is a proper sentencing consideration." *Sauerheber v. State,* 698 N.E.2d 796, 806 (Ind.1998). Therefore, it was proper for the trial court to consider the battery that occurred while Williams was in jail. In addition, Williams had a lengthy juvenile criminal history, which included "nine arrests resulting in four True Findings for charges of Disorderly Conduct, Battery, Theft, and Trespassing." Appellant's App. p. 194. A single aggravating circumstance can justify the enhancement of a sentence. *Powell v. State,* 769 N.E.2d 1128, 1135 (Ind.2002).

■ Williams also takes issue with the fact that the trial court found no mitigating circumstances. He claims that the trial court should have considered his youth at the time of the incident as a mitigating circumstance. The finding of mitigating circumstances is within the discretion of the trial court. *Mann v. State,* 742 N.E.2d 1025, 1027 (Ind.Ct.App.2001), *trans. denied.* A trial court is not required to give the same weight to a mitigating circumstance as the defendant would. *Id.* at 1028. To establish a reason-

able indication that a mitigating circumstance was overlooked, a defendant must show that it was significant and clearly supported by the record. *Id.* at 1027.

Williams fails to show that this circumstance was both significant and clearly supported by the record in his appeal. The trial court was therefore within its discretion when it rejected Williams's mitigating circumstance. Under all of these facts and circumstances, Williams's sentence of sixty-five years was not inappropriate in light of the nature of the offense and the character of the offender.

### Conclusion

The trial court did not abuse its discretion when it allowed Townsend's statements to Lieutenant Rice and Lucille into evidence as excited utterances and when it allowed the medical examiner to testify as to why some of Townsend's organs were not able to be harvested. The trial court also did not abuse its discretion when it read Final Instruction 10D to the jury. There was sufficient evidence to support Williams's conviction for murder, and his sentence of sixty-five years was not inappropriate.

Affirmed.

BAKER and RILEY, JJ., concur.