**Kevin O'BANION, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 27A02–0211–CR–959.**

Court of Appeals of Indiana.

June 5, 2003.

Todd A. Glickfield, Marion, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Nicole M. Schuster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Kevin O'Banion appeals his conviction of operating a vehicle while intoxicated ("OWI") after having a prior conviction thereof, a class D felony, and reckless driving, a class B misdemeanor.

We affirm.

### ISSUES

1. Whether O'Banion's OWI conviction must be reversed because the trial court erroneously admitted evidence of one field sobriety test, namely the horizontal gaze nystagmus test.

2. Whether O'Banion was denied his right to an impartial jury.

### FACTS

At about 8:00 p.m. on October 29, 2000, Marion Police Officer Dan Jeffries "clocked" O'Banion's vehicle with his radar unit and determined that O'Banion was traveling at an excessive speed. Officer Jeffries followed O'Banion for a short distance and observed him cross a double yellow center line to pass a vehicle and run a stop sign. Officer Jeffries activated his emergency lights. O'Banion pulled to the

side of the street, going "up over the curb" as he did so. (Tr. 157).

Officer Jeffries walked to O'Banion's door, and when O'Banion rolled down his window, the officer smelled the "very distinct odor" of an alcoholic beverage. (Tr. 158). When the officer asked him if he had had anything to drink, O'Banion "said he did not." *Id.* Officer Jeffries administered a portable breath test, which indicated "the presence of alcohol in his system." (Tr. 159). When asked a second time about alcohol consumption, O'Banion "said he had a couple beers." *Id.* Jeffries then asked O'Banion to "exit his vehicle and perform a series of field sobriety tests." (Tr. 160).

He first administered the horizontal gaze nystagmus test ("HGN"). O'Banion's upper body swayed as he stood there to begin the test. When Jeffries asked him to reach out and touch the tip of the pen he held, O'Banion required two attempts to do so. Then the officer moved the tip of the pen from side to side, having instructed O'Banion "to follow it with his eyes." (Tr. 165). Jeffries watched whether the eyes followed the movement smoothly, or—as in a person who has been drinking—with a "bounce" or "jerk motion." (Tr. 167). Jeffries did not have O'Banion cover one eye at a time during the test, but he did "watch[ ] one eye at a time" as he administered the test. (Tr. 168). When Jeffries observed that each of O'Banion's eyes "bounc[ed] back and forth," he concluded that O'Banion had failed the HGN test and he should "investigate further." (Tr. 186).

Jeffries then instructed O'Banion to perform the "walk and turn test," telling him to walk "with heel to toe" contact on each step, "hands down to his sides," for nine steps, then pivot on his left foot, and walk back nine steps. (Tr. 187). O'Banion "couldn't keep his balance" during the in-structions and on the first step, he "missed touching heel to toe on several of the steps"; O'Banion also exhibited "upper body sway," "raise[d] his hands for balance several times," and did not even try to pivot. (Tr. 188). Jeffries concluded that O'Banion had "failed the test" and determined "to give him the last test." (Tr. 192).

Jeffries instructed O'Banion to perform the "one legged stand," raising one foot about six inches off the ground and counting off thirty seconds in that position. (Tr. 192). After O'Banion tried three times, and each time had to lower his foot to the ground, Jeffries concluded that O'Banion had failed the third test as well.

Jeffries read O'Banion the warning of Indiana's implied consent law, and O'Banion said he "wasn't gonna take any f*** 'in' test." (Tr. 196). Jeffries then arrested O'Banion for operating a vehicle while intoxicated and transported him to the Grant County Sheriff's Department.

On arrival at the station, O'Banion asked if he could "get a drink of water," and Jeffries told him to wait. When O'Banion had the opportunity, he tried to drink from a water fountain—even though Jeffries "yelled at him, 'No' . . . three (3) times at the top of [his] lungs." (Tr. 200). At that point, O'Banion was taken to a cell, and no blood alcohol content test was ever administered.

O'Banion was charged with OWI, a class A misdemeanor, as well as the enhanced offense of OWI with a previous conviction thereof, a class D felony, and reckless driving. He was tried by a jury on June 12, 2002. At trial, Jeffries testified about the three field sobriety tests and O'Banion's performance thereof. O'Banion objected to testimony about his performance on the HGN test, arguing that it had not been properly administered; the trial

court overruled the objection. The jury observed the videotape of O'Banion and his lunge toward the water fountain at the station. The jury convicted O'Banion of the lesser OWI charge and reckless driving, and O'Banion pleaded guilty to having the previous OWI conviction, thus resulting in the instant OWI conviction constituting a class D felony.

### DECISION

#### 1. HGN Test Evidence

When considering a claim of trial court error in the admission of evidence, our supreme court has recently declared as follows:

> [a]s a general matter, the decision to admit or exclude evidence is within a trial court's sound discretion and is afforded great deference on appeal. We recently went so far as to say that we will not reverse the trial court's decision unless it represents a manifest abuse of discretion that results in the denial of a fair trial. An abuse of discretion in this context occurs where the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law.

*Carpenter v. State,* 786 N.E.2d 696, 702–03 (Ind.2003) (citations omitted).

O'Banion argues that the trial court committed reversible error when it admitted Officer Jeffries' testimony about his performance of the HGN test. Specifically, O'Banion posits that "the proper foundation for admitting HGN evidence" must show not only the officer's education and experience in administering the test but also "that the procedure was properly administered." O'Banion's Br. at 5. According to O'Banion, pursuant to *Cooper v. State,* 761 N.E.2d 900, 903 (Ind.Ct.App. 2002), such proper administration of the test includes that the driver "is asked to cover one eye and focus the other on an object." We disagree.

*Cooper* cites *State v. Superior Court in and for Cochise County,* 149 Ariz. 269, 718 P.2d 171, 173 (1986), which states as follows:

> Nystagmus is an involuntary jerking of the eyeball. [The involuntariness differentiates it from other field sobriety tests.] The jerking may be aggravated by central nervous system depressants such as alcohol or barbiturates. [citation omitted]. Horizontal gaze nystagmus is the inability of the eyes to maintain visual fixation as they are turned to the side. In the HGN test the driver is asked to cover one eye and focus the other on an object (usually a pen) held by the officer at the driver's eye level. As the officer moves the object gradually out of the driver's field of vision, toward his ear, he watches the driver's eyeball to detect involuntary jerking. The test is repeated with the other eye. By observing (1) the inability of each eye to track movement smoothly, (2) pronounced nystagmus at maximum deviation, and (3) onset of the nystagmus at an angle less than 45 degrees in relation to the center point, the officer can estimate whether the driver's blood alcohol content (BAC) exceeds the legal limit of .10 percent.

*Cooper,* 761 N.E.2d at 902–03. Thereafter, we noted that the National Highway Traffic Safety Administration had "concluded that HGN along with the walk-and-turn and one-leg stand tests were the most effective roadside testing to detect impaired drivers." We then determined that the proper foundation for the admission of HGN evidence consisted of "describing the officer's education and experience in administering the test and showing that the procedure was properly administered." 761 N.E.2d at 903.

Jeffries testified that he had been trained in a three-day National Highway Safety Traffic Administration course on field sobriety testing and had administered "thousands" of field sobriety tests during his thirteen years in police work. (Tr. 162). He explained what a HGN test showed, and how it was performed. In all respects his testimony matched that of the language from the Arizona court *except* that he did not ask O'Banion to cover one eye at a time. The trial court heard preliminary testimony from Officer Francis, a twenty-year veteran officer, who had completed the National Highway Safety Traffic Administration course within the past several weeks. Francis' testimony also mirrored the language from the Arizona court except that he also had not been taught to "cover the other eye" when he tested each eye "individually." (Tr. 178).

We cannot agree with O'Banion's premise: that covering one eye is a mandatory procedure for a valid HGN test. Nothing in the Arizona opinion indicated that what the HGN test considered—the "inability of the eyes to maintain visual fixation as they are turned to the side"—was affected by whether the eye was covered. 761 N.E.2d at 902–03. Both Officer Jeffries and Officer Francis testified that when administering the HGN test, they only observed one eye at a time. It may be that the protocol cited by the Arizona court for testing "each eye" included covering one eye as a visual cue to the testing officer to watch the other eye. 761 N.E.2d at 903. We believe that the thrust of *Cooper* is to provide that the proper HGN procedure is for the tester to move an object in a certain fashion in front of the driver and "watch[ ] the driver's eyeball to detect involuntary jerking." *Id.* This was done here. Hence, we find that the trial court did not err in admitting Officer Jeffries' testimony about O'Banion's performance on the HGN test.

2. *Jury Composition*

■ Before trial began, O'Banion objected "to the way the jury pool [was] selected." (Tr. 2). O'Banion pointed out that he was thirty-three years of age, and the jury pool was comprised of "one person in their thirties," five people "in their forties"—of whom, four were "49 years of age," sixteen people "in their fifties," six "in their sixties," and three "in their seventies"; so there were "more people in their seventies ... than ... in their thirties." (Tr. 7, 8). O'Banion called the trial court's bailiff to testify. The bailiff testified that she had been told "by Voter's Registration" that jurors were drawn from a list of registered voters that was compiled in the order in which voters had registered. (Tr. 2). Thus, "it was described to [her]" that those who had been registered for the longest period of time were the first called for jury duty. (Tr. 3). The trial court confirmed that jurors were called not "by age" but "by your time of when you registered." (Tr. 4). The trial court observed that age was "just one factor" in considering whether a jury was a cross-section of the community and denied O'Banion's motion.

O'Banion claims he was "denied his Sixth Amendment right to a fair cross-section of the county in his jury pool" because the county's system for calling potential jurors tended to exclude "younger members of the community." O'Banion's Br. at 6, 7. O'Banion argues that he "showed that the vast majority of the jury venire for his trial was over the age of fifty." O'Banion's Br. at 7. Therefore, he asserts, he "at least made a prima facie case that the normal age group selected for trials" in the court where he was tried was "not fair and reasonable in relation to the number of such persons in the community," warranting reversal and the grant of a new trial. *Id.* at 7. We cannot agree.

In order to make a prima facie showing of a violation of the Sixth Amendment's fair cross-section requirement, a defendant must establish:

(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Ewing v. State,* 719 N.E.2d 1221, 1226 (Ind.1999), (quoting *Duren v. Missouri,* 439 U.S. 357, 364, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

Thus, O'Banion was first required to show that "the group alleged to be excluded" was a " 'distinctive' group in the community." *Id.* In *Ewing,* there were no prospective jurors "under the age of fifty." 719 N.E.2d at 1226. Our supreme court held that persons aged eighteen to fifty were *not* a distinctive group "for purposes of the fair cross-section requirement." *Id.* Because *Ewing* held that there was no constitutional violation when there were *no* prospective jurors between the ages of eighteen and fifty, O'Banion's argument of constitutional infirmity based upon only about eighteen percent of the jurors being in that age group must fail. Having failed to satisfy the first prong of the applicable prima facie showing, the trial court did not err in concluding that O'Banion failed to demonstrate a violation of the fair-cross section requirement.

We affirm.

SULLIVAN, J., and BAKER, J., concur.