# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**DAVID L. STEINER**
Deputy Attorney General
Indianapolis, Indiana

**FRANCES BARROW**
Deputy Attorney General
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**TODD A. RICHARDSON**
**KEVIN A. MORRISSEY**
Lewis & Kappes
Indianapolis, Indiana



FILED

Jun 08 2012, 8:30 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL A. GARGANO, in his official capacity as Secretary of the Indiana Family and Social Services Administration, et al., | ) ) ) ) | |
| Appellants-Defendants, | ) ) | |
| vs. | ) ) | No. 49A02-1105-PL-449 |
| LEE ALAN BRYANT HEALTH CARE FACILITIES, INC., et al., | ) ) ) ) | |
| Appellees-Plaintiffs. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Dreyer, Judge
Cause No. 49D10-0911-PL-51397

**June 8, 2012**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

The Family and Social Services Administration ("FSSA"), the Division of Aging (the "DOA"), and Residential Care Assistance Program (the "RCAP," and FSSA, the DOA, and the RCAP, collectively, "Appellants"), appeal the February 15, 2011 judgment of the trial court in favor of Lee Alan Bryant Health Care Facilities, Inc.; Parkeview Residential Care Center, L.L.C.; Parke County Residential Care Center L.L.C.; Westpark Health Care Facilities, L.L.C. (together, "Providers"); Cheryl A. Holland; Ross Fisher; Patrick Zaborski; and Bryan Frison (Providers and individuals, collectively, "Appellees"). Appellants raise three issues, which we revise and restate as whether the court erred in entering judgment in favor of Appellees and against Appellants regarding the partial suspension of the RCAP. We reverse and remand.

BACKGROUND

The DOA is a division of FSSA and administers a variety of programs, including the RCAP, related to certain services for disabled or senior individuals. See Ind. Code § 12-9.1-4-2. Under the RCAP, an individual who is incapable of residing in the individual's own home may apply for residential care assistance. Ind. Code § 12-10-6-2.1(a) (Supp. 2008) (subsequently amended by Pub. L. 143-2011, § 11 (eff. Jul. 1, 2011)); Pub. L. 229-2011, § 19 (eff. Jul. 1, 2011)); Pub. L. 6-2012, § 89 (eff. Feb. 22, 2012)).[1] An individual is eligible for residential care assistance under the RCAP if the DOA determines that the individual is a recipient of Medicaid or the federal Supplemental Security Income program; is incapable of residing in the individual's own

---

[1] Effective July 1, 2011, following the February 15, 2011 judgment in this case, two versions of Ind. Code § 12-10-6-2.1 were enacted which contained different language in subsections (d) and (g), see Pub. L. 143-2011, § 11; Pub. L. 229-2011, § 19, and, effective February 22, 2012, one of those versions was eliminated. See Ind. Code § 12-10-6-2.1(d) (Supp. 2012).

home because of dementia, mental illness, or a physical disability; requires a degree of care less than that provided by a health care facility licensed under Ind. Code § 16-28; can be adequately cared for in a residential care setting; and has not made any asset transfer prohibited under the state plan or in 42 U.S.C. 1396p(c) in order to be eligible for Medicaid. Id. Residential care under the RCAP, with certain exceptions related to individuals with a mental illness, consists of only room, board, and laundry, along with minimal administrative direction. Ind. Code § 12-10-6-2.1(d); Ind. Code § 12-10-6-5.[2]

---

[2] At the time of the initiation of this action in November 2009 and the February 15, 2011 judgment, Ind. Code § 12-10-6-2.1(d) included the following language:

> State financial assistance may be provided for such care in a boarding or residential home of the applicant's choosing that is licensed under IC 16-28 or a Christian Science facility listed and certified by the Commission for Accreditation of Christian Science Nursing Organizations/Facilities, Inc., that meets certain life safety standards considered necessary by the state fire marshal. Payment for such care shall be made to the provider of the care according to division directives and supervision. The amount of nonmedical assistance to be paid on behalf of a recipient living in a boarding home, residential home, or Christian Science facility shall be based on the daily rate established by the division. The rate for facilities that are referred to in this section and licensed under IC 16–28 may not exceed an upper rate limit established by a rule adopted by the division.

Ind. Code § 12-10-6-2.1(d) (Supp. 2008) (subsequently amended by Pub. L. 143-2011, § 11 (eff. Jul. 1, 2011)); Pub. L. 229-2011, § 19 (eff. Jul. 1, 2011)); Pub. L. 6-2012, § 89 (eff. Feb. 22, 2012)). Further, subsection (g) at that time provided:

> The rate of payment to the provider shall be determined in accordance with a prospective prenegotiated payment rate predicated on a reasonable cost related basis, with a growth of profit factor, as determined in accordance with generally accepted accounting principles and methods, and written standards and criteria, as established by the division. The division shall establish an administrative appeal procedure to be followed if rate disagreement occurs if the provider can demonstrate to the division the necessity of costs in excess of the allowed or authorized fee for the specific boarding or residential home. The amount may not exceed the maximum established under subsection (d).

Effective July 1, 2011, two versions of Ind. Code § 12-10-6-2.1(d) were enacted, one of which retained the language in subsections (d) and (g) above, see Pub. L. 143-2011, § 11, and the other of which eliminated the language, see Pub. L. 229-2011, § 19. Effective February 22, 2012, the version of Ind. Code § 12-10-6-2.1 which did not include the language set forth above was enacted. See Ind. Code § 12-10-6-2.1(d) (Supp. 2012).

Prior to April 2003, the DOA established a unique reimbursement rate for each facility provider based upon the facility's actual costs in providing services under the RCAP and the rates were calculated in accordance with generally accepted accounting principles and methods.[3] In April 2003, the RCAP began providing a uniform or standard per diem reimbursement rate to all facility providers in the amount of $39.35. See 455 Ind. Admin. Code 1-3-3(b) (Transferred from the Division of Disability and Rehabilitative Services (460 IAC 1-3.3-3) to the Division of Aging (455 IAC 1-3-3) by Pub L. No. 153-2011, § 21 (eff. Jul. 1, 2011)).[4] According to the parties, in July 2008 the standardized per diem reimbursement rate under RCAP was changed to the amount of $49.35.[5]

At some point, FSSA's chief financial officer, Megan Ornellas, received notification from a budget analyst with the State Budget Agency that the allotments for FSSA for fiscal year 2010 had been reduced. On September 21, 2009, Anne Murphy, Secretary of FSSA, sent an email message to Faith Laird, Director of the DOA, related to certain constraints regarding FSSA's fiscal year 2010 biennium budget, explained that the

---

[3] There is another rate paid under the RCAP for county-owned homes. Providers in this case are not county-owned homes.

[4] 455 Ind. Admin. Code 1-3-3(b) provides:

Subject to the availability of funds appropriated for the residential care assistance program, a facility that is licensed under IC 16-28 that is providing residential care shall receive per diem reimbursement of thirty-nine dollars and thirty-five cents ($39.35) for each recipient receiving residential care assistance from the division. This per diem reimbursement takes into account the rules for residential care for facilities that are licensed under IC 16-28. If such facility charges the general public a rate of less than thirty-nine dollars and thirty-five cents ($39.35), the facility shall receive per diem reimbursement from the division equal to the rate the facility charges the general public.

[5] The parties do not point to an administrative rule which reflects the increased amount of $49.35.

4

FSSA fiscal year 2010 budget along with the reserve it was expected to return to the State's general fund at the end of the year was insufficient to support its current operations,[6] and asked Laird to review the division's budget and report savings measures or projections and a strategy to reduce the division's budget by $2.8 million. Murphy also indicated that any reductions should be from non-Medicaid programs. On October 2, 2009, Laird sent an email message to Murphy which attached a revised proposed budget and stated that the revision "produces a savings of $2,099,305 to $2,379,805," that "[w]e have only two large sources of State funds: CHOICE ($48,765,643) and RCAP ($13,477,844)," and that "[t]he savings achieved in the RCAP program will be by attrition—not permitting any new admissions—but would not require discharge of current participants in the program." Plaintiff's Exhibit 4. On October 28, 2009, FSSA sent a written notice to Providers and other residential care facilities which received funds from the RCAP stating that due to budgetary constraints currently affecting all state agencies the RCAP would not be accepting new applications effective December 1, 2009, and that the DOA would accept new applications only until the close of business on November 30, 2009.

Following December 1, 2009, a number of applications for the RCAP submitted by individuals admitted to Providers' facilities were denied.[7]

---

[6] According to the testimony of Ornellas, FSSA's chief financial officer, the State Budget Agency uses reversion targets or reserved funds to reduce expenditures from the State's general fund in anticipation of a projected revenue shortfall in order to continue operations.

[7] A memorandum dated April 21, 2010, from the State Budget Agency to all State agencies stated that in the first nine months of fiscal year 2010 state revenues had declined 9.4% versus the prior year and that revenue collections for fiscal year 2011 would be lower than fiscal year 2006 collections. The memorandum directed all agencies to create a fiscal year 2011 spending plan which included a reserve of fifteen percent, which represents an increase of five percent compared to the fiscal year 2010 target. The

5

## COURSE OF PROCEEDINGS

Appellees filed an amended verified complaint for declaratory, injunctive and other relief against Appellants in March 2010 alleging that FSSA's refusal to fund eligible applicants despite having appropriated and allotted funds accessible to the RCAP is directly contrary to the authority granted to FSSA by the legislature under Ind. Code § 12-10-6.[8] Appellees further alleged that the imposition in 2003 of a fixed rate of reimbursement for all providers under the RCAP is a violation of the mandatory requirements of Ind. Code § 12-10-6 which require FSSA and the DOA to determine the rate of reimbursement according to individual provider's actual costs and accounting for a growth of profit factor.

Appellants filed a motion for summary judgment, which the court denied. Appellees filed a motion for partial summary judgment, which the court granted with respect to the determination of the amount of assistance for eligible applicants on or before December 1, 2009 and denied in all other respects.[9]

A bench trial was held on December 6, 2010, at which the parties presented a number of exhibits and testimony related to the State's budgeting process and the RCAP. Megan Ornellas, FSSA's chief financial officer, testified that the State Budget Agency

---

memorandum also provided that the reserve should be applied to all functions of an agency and that any exceptions must be approved by the State Budget Agency.

[8] The initial complaint in November 2009 named Providers as plaintiffs, and the amended complaint, in addition to Providers, included the named plaintiffs of Holland, Fischer, Zaborski, and Frision, who are mentally disabled persons. The amended complaint also included claims under the Americans with Disability Act and Section 504 of the Rehabilitation Act, but the parties later stipulated to the dismissal of these claims.

[9] The parties' summary judgment motions are not included in the record.

uses reversion targets or reserved funds to reduce expenditures from the State's general fund in anticipation of a projected revenue shortfall in order to continue operations. Ornellas indicated that for each fiscal year FSSA sets aside a certain reserve, which is a percentage of its total appropriations with some adjustments, with the intention of returning the reserve to the State's general fund at the end of the fiscal year. Ornellas further testified that the State Budget Agency does not instruct FSSA how it must fund the reserve and that instead FSSA may select different programs under its supervision from which to fund the dollar amount of the reserve. Ornellas indicated that FSSA leaves the decision as to how each of its divisions, including the DOA, meets its share of the reserve to the discretion of the director of that division. Ornellas also indicated that a division's sources of reserved funds may change from year to year and that a program that was initially identified as a source of reserved funds can spend those funds and the reserve is taken from a different program. The controller for the DOA testified that the DOA has discretion in determining which of its programs will fund its share of the reserve. In addition, Laird, the director of the DOA, testified that the RCAP is not a program required by federal law, that it is not an entitlement program, and that it is not under an obligation to accept all eligible individuals. The State's reversions for all funds as set forth by the State Budget Agency for fiscal years 2005-2006 through 2008-2009 were admitted into evidence.

On February 15, 2011, the court entered findings of fact, conclusions of law and judgment in favor of Appellees. The court found that Appellants' denial of awards of assistance to post-moratorium applicants was unlawful and in violation of the mandatory

7

obligations imposed by Ind. Code § 12-10-6, that Appellants were and currently are obligated to pay awards of assistance to each of the post-moratorium applicants, and that Providers suffered damages of $176,664.25 as a result of the unlawful actions. The court awarded Providers damages in the amount of $176,664.25, declared that the December 1, 2009 suspension of the acceptance and payment of financial assistance to new, eligible applicants under the RCAP was unlawful, and ordered Appellants to determine awards of assistance which take into account the individual applicants' financial condition and pay such awards until and only if funds appropriated for RCAP have been depleted.

The court further found that for each of the years in which Providers were paid a single rate of $39.35 or $49.35, the rate, with respect to Providers, was not properly calculated under the requirements of Ind. Code § 12-10-6. Specifically, the court found that Ind. Code § 12-10-6-3(d) and Ind. Code § 12-10-6-14 establish safeguards designed to ensure any rate set by Appellants, including any upper rate limit, is predicated on a reasonable costs basis taking into account the provider facilities' actual costs. The court ordered Appellants to calculate a reimbursement rate for Providers for each year since 2003 which accounts for the actual costs incurred by Providers in providing services under the RCAP, is predicated on a reasonable cost basis with a growth of profit factor, and is in accordance with generally accepted accounting principles and methods. Appellants filed a motion to correct errors, which the court denied.

ISSUE AND STANDARD OF REVIEW

The issue is whether the court erred in entering judgment on February 15, 2011 in favor of Appellees and against Appellants regarding the partial suspension of the RCAP

8

and order regarding the reimbursement rate for Providers. Where a trial court enters findings of fact and conclusions of law, first we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. Zukerman v. Montgomery, 945 N.E.2d 813, 818 (Ind. Ct. App. 2011) (citing In re Guardianship of Phillips, 926 N.E.2d 1103, 1106-1107 (Ind. Ct. App. 2010)).

The specific findings control only as to the issues they cover, and a general judgment standard applies to issues upon which the trial court made no findings. Id. (citing Guardianship of Phillips, 926 N.E.2d at 1107; Rea v. Shroyer, 797 N.E.2d 1178, 1181 (Ind. Ct. App. 2003)). When making this determination, we neither reweigh the evidence nor assess the credibility of the witnesses. Id. (citing Ballew v. Town of Clarksville, 683 N.E.2d 636, 639 (Ind. Ct. App. 1997), trans. denied). We review questions of law *de novo* and owe no deference to the trial court's legal conclusions. Id. (citing M.K. Plastics Corp. v. Rossi, 838 N.E.2d 1068, 1075 (Ind. Ct. App. 2005); Shriner v. Sheehan, 773 N.E.2d 833, 841 (Ind. Ct. App. 2002), trans. denied).

When interpreting a statute, we independently review a statute's meaning and apply it to the facts of the case under review. Cook v. Atlanta, Ind. Town Council, 956 N.E.2d 1176, 1178 (Ind. Ct. App. 2011) (citing Bolin v. Wingert, 764 N.E.2d 201, 204 (Ind. 2002)), reh'g denied. Thus, we need not defer to a trial court's interpretation of the statute's meaning. Id. (citing Elmer Buchta Trucking, Inc. v. Stanley, 744 N.E.2d 939, 942 (Ind. 2001)). The first step in interpreting any Indiana statute is to determine whether the legislature has spoken clearly and unambiguously on the point in question. Id. (citing St. Vincent Hosp. and Health Care Ctr., Inc. v. Steele, 766 N.E.2d 699, 703-

9

704 (Ind. 2002)). If a statute is unambiguous, we must give the statute its clear and plain meaning. Id. (citing Bolin, 764 N.E.2d at 204). A statute is unambiguous if it is not susceptible to more than one interpretation. Id. (citing Elmer Buchta Trucking, 744 N.E.2d at 942). However, if a statute is susceptible to multiple interpretations, we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. Id. (citing Bolin, 764 N.E.2d at 204). We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. Id. In addition, we will avoid an interpretation that renders any part of the statute meaningless or superfluous. Id.

## DISCUSSION

Appellants maintain that the trial court erred in concluding (A) that the denial of awards under the RCAP following the December 1, 2009 moratorium was unlawful; and (B) that the reimbursement rates paid by the RCAP to Providers were unlawful.

### A. The December 1, 2009 Moratorium

Appellants contend that the court's judgment violated separation of powers, that the court improperly invaded the exclusive province of FSSA and its divisions to manage funds appropriated for their programs, and that the decision to impose a moratorium on new RCAP applications as a means of operating the program within its budget was a decision solely within the discretion and authority of the executive branch. Appellants further maintain that Indiana law does not create a mandatory obligation to award assistance to all RCAP applicants and therefore that the court's mandate was improper as a matter of law.

10

Appellees maintain that the separation of powers doctrine does not grant agencies the power to rescind provisions enacted by the legislature, that this is not a case in which the judiciary is infringing the prerogative of the executive, and that rather the court enforced the unambiguous terms of the RCAP statute in the face of the agency's efforts to relieve itself of the express terms of the legislation. Appellees assert that Appellants do not have unilateral discretion to discontinue funding for a statutory program where the legislature has duly appropriated available funds and that, in effect, FSSA and the DOA assumed for themselves the prerogative to discontinue a program created by the General Assembly and duly provided for by legislative appropriation.

In their reply brief, Appellants argue that the separation of powers argument is not an attempt to avoid the statutory requirements of the RCAP but that the separation of powers doctrine prohibits the judiciary from second-guessing the manner in which executive agencies deal with projected budget shortfalls. Appellants also argue that no provision of the RCAP mandates or requires the agency to provide benefits to particular applicants and that FSSA and the DOA must have discretion to manage the RCAP funds along with the funds of other programs so that it can ensure that it does not overspend its appropriations and permit the absurd result of allowing appropriations to run out for existing recipients during a biennium.

We note that Ind. Code § 4-13-2-18 in part governs the administration of the allotment system and provides for among other things when an appropriation to a state agency may become available for expenditure, the role of the state budget agency in

11

reviewing requests for allotments, and the authority of the state budget agency and director in modifying or reducing amounts allotted or to be allotted to prevent a deficit.

Ind. Code § 12-10-6 governs eligibility for and the administration of the RCAP. While the provisions of Ind. Code § 12-10-6 set forth the responsibilities of the DOA in administering the operations and procedures of the RCAP, including the determination of applicants' eligibility and assistance amounts and reporting and other processes, the provisions found at Ind. Code § 12-10-6, similar to most statutory schemes governing specific programs administered by agencies such as FSSA, do not expressly provide a separate or alternate set of provisions governing the program's operations and procedures in the event that State funds or revenues, projected or actual, will not be or are not equal to or greater than the costs of or amounts allotted to the program.[10] See Ind. Code § 12-10-6. Appellees do not point to provisions of Ind. Code § 12-10-6, Ind. Code § 4-13-2, or other statutes which require that a certain dollar amount or percentage of the funds initially identified or allotted to pay for the costs of the RCAP by the legislature or FSSA and the DOA may not be later reduced or redirected to other programs administered by the DOA in order to comply with revised budget directives of the State Budget Agency. See Ind. Code § 4-13-2-18(f) (providing that, if the state budget director discovers that the probable receipts from taxes or other sources will be less than were anticipated and as a consequence the amount available for the remainder of the term of the appropriation or for any allotment period will be less than the amount estimated or allotted, then the state

---

[10] Laird testified that FSSA has five operational divisions including the DOA, the Office of Medicaid Policy and Planning, the Division of Family Resources, the Division of Mental Health and Addiction, and the Division of Disability and Rehabilitated Services.

budget director shall with the approval of the governor and after notice to the state agency reduce the amount allotted or to be allotted so as to prevent a deficit).

Absent specific statutory provisions preventing FSSA and the DOA from making such internal budget and program decisions based upon actual or projected funding as to a specific program such as the RCAP, we decline to hold that FSSA and the DOA may not exercise or perform conventional administrative and executive steps of directing or redirecting allotted funds in order to meet the directives of the State Budget Agency. See Lee Alan Bryant Health Care Facilities, Inc. v. Hamilton, 788 N.E.2d 495, 501 (Ind. Ct. App. 2003) (holding that certain provisions of the Indiana Administrative Code which provided that the availability of residential care assistance is contingent upon the availability of residential care assistance funding were valid and that the court could not require FSSA to fund all eligible RCAP applicants), clarified on reh'g, 793 N.E.2d 229, 230-231 (Ind. Ct. App. 2003) (holding that, absent a statutory mandate to fund all eligible RCAP applicants, there is no legal obligation to do so and that Ind. Code § 12-10-6 does not prohibit the agency division from disbursing its RCAP appropriation at its discretion); Cf. Center Tp. of Marion Cnty. v. Coe, 572 N.E.2d 1350, 1358 (Ind. Ct. App. 1991) (addressing the statutory obligation of a township trustee and holding that the statutory scheme at issue "detail[ed] the process by which distressed townships . . . may overcome financial difficulties" and that "[i]f a township cannot provide the benefits mandated by the statute, it does not have the option of failing to provide benefits; rather, it must follow the statutory guidelines developed for such an eventuality").

13

Based upon the provisions of Ind. Code § 12-10-6 and the evidence presented at the bench trial regarding the State's budgeting process, we conclude that FSSA and the DOA were not prohibited from making a determination to limit future admissions to the RCAP to maintain expenditures within the constraints of the agency's allotment and the directives of the State Budget Agency. Accordingly, we reverse the trial court's February 15, 2011 judgment awarding Providers damages, declaring that the December 1, 2009 moratorium was unlawful, and ordering Appellants to determine awards of assistance for applications submitted after December 1, 2009.

B.    Reimbursement Rates

Appellants maintain that the court's injunction relating to rate calculations was useless and should be set aside because, starting in 2003, Providers were never entitled to a higher rate than the upper rate limit or maximum rate established by FSSA by rule and that Providers were not harmed by any failure of FSSA to make rate and cost calculations based on a reasonable cost basis with a growth factor in accordance with generally accepted accounting principles and methods. Appellants argue that no provision in Ind. Code § 12-10-6 provides that the upper rate limit established by the agency was required to be based on the reasonable costs of the RCAP providers and that the trial court did not recognize that the relevant statutes contemplate the creation of two rates, one rate, the facility rate, based on a reasonable cost with a growth of profit factor as provided in Ind. Code § 12-10-6-2.1(g) and another rate, the upper rate limit, which is set by the agency by rule. Appellants assert that the record shows that Providers were always paid the

14

maximum set by rule or even greater amounts and that Providers were clearly not harmed by any actions or omissions of the agency.

Appellees maintain that Appellants cannot rely on rulemaking authority to set rates that deviate from the standard defined by the governing statute. Appellees argue that Appellants' assertion that the RCAP statute allows them to set a single, maximum rate which is not predicated on any analysis of the actual costs of the providers being reimbursed is contrary to the clear and unambiguous language of the RCAP statutory provisions that govern lawful rate levels. Appellees argue that subsections (d) and (g) of Ind. Code § 12-10-6-2.1 clearly require that any rate set by Appellants, including a maximum rate set by administrative rule, must be predicated on a reasonable costs basis taking into account the provider facilities' actual costs as determined in accordance with generally accepted accounting principles. Appellees further argue that if this court were to accept Appellants' argument that they can set by rule a maximum rate any level they choose without regard to actual or reasonable costs of providers, then the rate review procedures set forth in Ind. Code §§ 12-10-6-3 and -14 would be rendered meaningless.

In their reply brief, Appellants argue that Appellees are simply incorrect when they contend that the RCAP law required FSSA to establish an upper rate limit that was based on the individual facility rates, that the statutes establish an upper rate limit that is entirely separate from the facility rates, and that nothing in the statutes provides that the upper rate limit must take into account the actual or reasonable costs of the providers. Appellants further argue that a two-rate system which is clearly prescribed by RCAP law

15

does not make the calculation of the facility rate meaningless and that the system is consistent with the text of the provisions.

At the time of the complaint and February 15, 2011 judgment in this case, subsection (d) of Ind. Code § 12-10-6-2.1 provided in part:

> Except as provided in section 5 of this chapter, residential care consists of only room, board, and laundry, along with minimal administrative direction. . . . Payment for such care shall be made to the provider of the care according to division directives and supervision. The amount of nonmedical assistance to be paid on behalf of a recipient living in a boarding home, residential home, or Christian Science facility *shall be based on the daily rate established by the division.* The rate for facilities that are referred to in this section and licensed under IC 16-28 *may not exceed an upper rate limit established by a rule adopted by the division. . . .*

(Emphases added).

Subsection (g) of Ind. Code § 12-10-6-2.1 provided:

> *The rate of payment to the provider shall be determined in accordance with a prospective prenegotiated payment rate predicated on a reasonable cost related basis, with a growth of profit factor, as determined in accordance with generally accepted accounting principles and methods, and written standards and criteria, as established by the division.* The division shall establish an administrative appeal procedure to be followed if rate disagreement occurs if the provider can demonstrate to the division the necessity of costs in excess of the allowed or authorized fee for the specific boarding or residential home. *The amount may not exceed the maximum established under subsection (d).*

(Emphases added).[11]

We will avoid an interpretation that renders any part of a statute meaningless or superfluous. The first sentence of subsection (g) refers to a prenegotiated payment rate to

---

[11] As previously noted, following the February 15, 2011 judgment in this case, two versions of Ind. Code § 12-10-6-2.1(d) were enacted, only one of which retained the language in subsections (d) and (g) above, see Ind. Code § 12-10-6-2.1(d) (Supp. 2011); Pub. L. 143-2011, § 11; Pub. L. 229-2011, § 19, and effective February 22, 2012, a version of Ind. Code § 12-10-6-2.1 was enacted which did not include the language above. See Ind. Code § 12-10-6-2.1(d) (Supp. 2012).

16

a provider and the last sentence refers to a maximum amount or rate of payment, namely the maximum established under subsection (d). The last sentence of subsection (g) would be rendered meaningless if the maximum rate of payment and the prenegotiated payment rate were always identical. Further, the first sentence of subsection (g) expressly provides that a prenegotiated payment rate is predicated on a reasonable cost related basis with a growth of profit factor in accordance with generally accepted accounting principles and methods and written standards and criteria as established by the division. However, no language in subsections (d) or (g) expressly requires the maximum rate of payment referred to in the last sentence of subsection (g) and identified in subsection (d) as the upper rate limit to be established by a rule adopted by the division to be predicated on the same bases as a prenegotiated payment rate. Further, the provisions of Ind. Code §§ 12-10-6-3 and -14 do not expressly require that the upper rate limit be predicated on the same bases as a prenegotiated payment rate.[12] Even if a prenegotiated payment rate

---

[12] Ind. Code §§ 12-10-6-3 and -14 were repealed effective July 1, 2011. See Pub. L. 229-2011, § 272 (eff. Jul. 1, 2011). At the time of the complaint and order, Ind. Code § 12-10-6-3 provided in part:

(a)     The division, in cooperation with the state department of health, taking into account licensure requirements under IC 16-28, shall adopt rules under IC 4-22-2 governing the reimbursement to facilities under section 2.1 of this chapter. The rules must be designed to determine the costs that must be incurred by efficiently and economically operated facilities in order to provide room, board, laundry, and other services, along with minimal administrative direction to individuals who receive residential care in the facilities under section 2.1 of this chapter.

* * * * *

(d)     The division shall annually review each facility's rate using the following:

(1)     Generally accepted accounting principles.

(2)     The costs incurred by efficiently and economically operated facilities in order to provide care and services in conformity with quality and safety standards and applicable laws and rules.

17

for Providers was not established in accordance with subsections (d) and (g) of Ind. Code § 12-10-6-2.1, Providers received the upper rate limit and thus Providers cannot be entitled to reimbursement amounts greater than the amounts they received under the RCAP from 2003 through 2009. Accordingly, we reverse the court's February 15, 2011 judgment that the reimbursement rates paid by the RCAP to Providers from 2003 through 2009 were unlawful and that Appellants calculate a reimbursement rate for each of Providers for each year since 2003 predicated on a reasonable cost basis.

For the foregoing reasons, we reverse and remand for proceedings consistent with this opinion.

Reversed and remanded.

MAY, J., and CRONE, J., concur.

---

Ind. Code § 12-10-6-3 (Supp. 2008). Ind. Code § 12-10-6-14 (Supp. 2007) provided in part that each facility that receives funding from the State shall file an operation cost report, that the "division shall annually conduct a review of the operation cost reports" for the facilities "to determine the actual cost of providing services to individuals who receive residential care assistance" and that "[a]pplying the results of the review . . . , the division shall submit a recommended modification of rate reimbursement for residential care assistance to the budget agency before April 1 of each year." The substantive provisions of the subsections of Ind. Code §§ 12-10-6-3 and -14 set forth above were also in effect from 2003 to 2008. See Pub. L. No. 2-1992, Pub. L. No. 24-1997, §§ 24, 26.