# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 04 2016, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mary Beth Mock
Law Office of Mary Beth Mock
Madison, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jody Michael Brooks,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

November 4, 2016

Court of Appeals Case No.
40A04-1512-CR-2373

Appeal from the Jennings Circuit Court

The Honorable Jon W. Webster, Judge

Trial Court Cause No.
40C01-1410-MR-5

**Bradford, Judge.**

# Case Summary

In October of 2014, Appellant-Defendant Jody Brooks and Jovannie Mays murdered Richard Smith.  Brooks and Mays subsequently fled the murder scene.  During the course of their flight, Brooks and Mays stole two trucks.  Brooks was subsequently charged with and convicted of murder, robbery resulting in serious bodily injury, and two counts of auto theft.  He was subsequently sentenced to an aggregate term of sixty-two years.  On appeal, Brooks challenges his convictions and sentence by asserting that (1) his murder and robbery convictions should be reversed because the trial court committed fundamental error, (2) the trial court abused its discretion by excluding certain evidence and by admitting certain other evidence, (3) his sentence is inappropriate in light of the nature of his offenses and his character, and (4) the trial court erred by failing to advise him of certain possible release dates from incarceration.  We affirm.

# Facts and Procedural History

At some point during the late-evening hours on October 16, 2014 or early-morning hours on October 17, 2014, Brooks and Mays came upon Smith who had passed out in the common hallway of the Hatton Carpet apartment complex in North Vernon.  Brooks and Mays initially walked by Smith before entering the apartment of a friend.  When they entered the apartment, Brooks indicated that he had taken the knit cap he was wearing from the man passed out in the hallway.  Eventually, Brooks and Mays were asked by Nicole

Spurlock to leave the apartment because they were intoxicated and loud and there were children sleeping in the apartment. When Brooks and Mays left the apartment, they tripped over Smith, who was still passed out in the hallway. Spurlock observed Mays kick Smith's head after which she said, "don't hurt him, don't kick him just try to wake him up." Tr. p. 1125. While Spurlock, Mays, and another individual who had been in the apartment remained near the door to the apartment, Brooks took hold of Smith and dragged Smith down the hallway, through the hallway door. Brooks continued to drag Smith outside, over two concrete steps, to an area near the apartment building's trash collection spot.

[3] Smith's nude body was discovered later in the day on October 17, 2014, when a resident of the apartment complex took out his trash. Upon discovering Smith's body, the resident called 911 to report the discovery. As the North Vernon Police Department ("NVPD") investigated the discovery of Smith's body, it became apparent that Smith had been murdered. Brooks and Mays soon became suspects in Smith's murder and were quickly located in Harrison County, near Corydon. When a representative of the NVPD reached out to the Harrison County Sheriff's Department to ask for assistance, the representative learned that Officer Duane Avis of the Corydon Police Department had already made contact with Brooks and Mays.

[4] Officer Avis first encountered Brooks and Mays on the evening of October 17, 2014, after having been dispatched to investigate a report of an accident. In responding to the dispatch, Officer Avis observed Brooks and Mays walking

along the same road as the reported accident. Officer Avis knew Brooks and questioned the men. Officer Avis then inspected the reported scene of the accident, discovering that a truck had been driven off the road and into a ravine where it struck a tree. The truck had been left in gear and its engine was still running. The license plate, however, was missing. Additional officers responding to the scene located the missing license plate in Brooks's clothing. Officer Avis subsequently determined that the truck had been reported stolen in Jennings County earlier that morning by Kenny Maschino.

[5] Also on October 17, 2014, Jennings County officers found a second abandoned truck a few miles from Maschino's residence. The second truck had also been left in a ditch. Its front end was covered with soybean plants, indicating it had been driven through a soybean field. Officers later determined that this truck had been stolen from Levi Horton. Mays subsequently explained that after murdering Smith, he and Brooks had hitch-hiked to the apartment complex where Horton lived and had stolen the truck. Mays also explained that he and Brooks had taken a nap at Brooks's girlfriend's residence in Corydon in the time between stealing the second truck from Maschino and intentionally wrecking it in the ravine.

[6] Brooks was interviewed by investigating authorities and, after being read his *Miranda*[1] rights, admitted that he and Mays had been drinking and that they had

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

dragged Smith down the hallway and out to the apartment complex's trash collection area. Brooks further admitted to rifling Smith's pockets before helping Mays "flip" Smith into the trash area. Tr. p. 1411. Brooks indicated that he had "blacked out" and could not recall what happened after he and Mays dragged Smith to the trash area. Tr. p. 1410.

[7] An autopsy later determined that Smith had suffered over fifty wounds. These wounds included numerous cuts and bruises; long excoriations to his back that were consistent with dragging; bruising and hemorrhaging of Smith's brain; multiple fractures to his nose, face, and eye socket; a fractured left hyoid bone;[2] two fractures in his neck; factures of the ribs in five areas together with a punctured lung; hemorrhaging to Smith's left testes; and a tear in Smith's aorta which was "absolutely lethal" and had been the immediate cause of his death. Tr. p. 1325. A sample from the steel-toed boots which Brooks was wearing at the time of his encounter with Smith were subjected to forensic DNA analysis and were found to bear Smith's DNA profile, which would be present only once in eight trillion unrelated individuals.

[8] On October 22, 2014, Appellee-Plaintiff the State of Indiana ("the State") charged Brooks with murder, robbery resulting in serious bodily injury, and two counts of auto theft. The trial court conducted a jury trial between August 24,

---

[2] The hyoid bone is a u-shaped bone found in the neck. Its primary function is to serve as an anchoring structure for the tongue. *See* https://www.britannica.com/science/human-skeletal-system/Interior-of-the-cranium#ref470803 (last visited October 20, 2016).

and August 31, 2015 ("the first trial"). At the conclusion of the first trial, the jury found Brooks guilty of the two counts of auto theft but was unable to reach a unanimous verdict on the murder or robbery charges. The trial court thereafter declared a mistrial as to the murder and robbery charges and entered judgment of conviction on the auto theft counts. The trial court conducted Brooks's second trial ("the murder trial") on November 12, through November 19, 2015. At the conclusion of the murder trial, the jury found Brooks guilty of both the murder and robbery charges. On December 7, 2015, the trial court sentenced Brooks for all of the related charges to an aggregate sixty-two-year term of imprisonment. This appeal follows.

# Discussion and Decision

[9] On appeal, Brooks raises the following contentions: (1) whether the trial court committed fundamental error, (2) whether the trial court abused its discretion in admitting and excluding certain evidence, (3) whether his sentence is inappropriate, and (4) whether the trial court erred by failing to advise him of his earliest possible release date.

# I. Fundamental Error

[10] In challenging his murder and robbery convictions, Brooks contends that the trial court committed fundamental error.

> Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the

defendant's rights as to "make a fair trial impossible." *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002), *quoted in* [*Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012)] and [*Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)]. In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." *Id*. The element of such harm is not established by the fact of ultimate conviction but rather "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled." *Townsend v. State*, 632 N.E.2d 727, 730 (Ind. 1994) (quoting *Hart v. State*, 578 N.E.2d 336, 338 (Ind. 1991)). In evaluating the issue of fundamental error, our task in this case is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *See Boesch v. State*, 778 N.E.2d 1276, 1279 (Ind. 2002); *Townsend*, 632 N.E.2d at 730; *see, e.g.*, *Castillo*, 974 N.E.2d at 469 n.11 (noting closing arguments are perceived as partisan advocacy).

We stress that "[a] finding of fundamental error essentially means that the trial judge erred ... by not acting when he or she should have...." *Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012). Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or strategically fail to preserve an error.

*Ryan v. State*, 9 N.E.3d 663, 668 (Ind. 2014) (internal citation omitted, emphasis to *sua sponte* and third set of brackets in original).

[11]   Brooks argues that the trial court committed fundamental error in three ways: (1) by mentioning the first trial during his murder trial, (2) by admitting evidence relating to the theft of two vehicles, and (3) by allowing his probation officer to testify regarding self-incriminating statements made by Brooks. Brooks further argues that these errors were such that would require reversal of his murder and robbery convictions. For its part, the State argues that Brooks's convictions should be affirmed because Brooks has failed to establish that any alleged error of the trial court constituted fundamental error.

## A.  Mention of the First Trial

[12]   Brooks argues that the trial court committed fundamental error by mentioning the first trial during the murder trial. The record demonstrates that during the murder trial, the following exchange occurred between NVPD Detective Ivory Sandefur, the prosecuting attorney, and the trial court:

> [The State]:  This is a copy of State's Exhibit #6 the dumpster one is that correct?
> [Witness]:        That is correct.
> [The State]:  Is that how it was when you first saw it other than the crime scene tape, I mean was the door closed like it is there?
> [Witness]:        Yes.
> [The Court]: Officer Sandefur this came up during the first trial, is there actually a dumpster in there or is it just trash throw [sic] in loose?
> [Witness]:        It's just trash thrown in loose.

Tr. p. 1162. Questioning then continued with no additional reference to the first trial.

[13] Review of the record indicates that the trial court did not make any other mention of the first trial or discuss the first trial in any detail before the jury.[3] Brooks's counsel acknowledges that he did not object to the trial court's statement because "to do so would have only highlighted the trial court judge's statement and would have created more prejudice to him." Appellant's Br. p. 14. Brooks's counsel also conceded that the trial court merely misspoke and did not intend to discuss the first trial in any significant fashion. Brooks does not establish, and the record does not support, a finding that the trial court's single reference to the first trial, without more, made it impossible for Brooks to receive a fair trial in the murder trial. As such, we conclude that the trial court's brief mention of the first trial did not constitute fundamental error.[4] *See*

---

[3] During a conference held outside of the presence of the jury, the trial court noted that with respect to evidence relating to the auto thefts, "there was never a mention of a conviction never a mention that it was discussed in the first trial, and I have prepared an instruction which will admonish the jury that they are to consider it only for the purposes of identifying the Defendant and flight." Tr. p. 1378. To the extent that Brooks contends that this statement shows that his first trial was mentioned a second time, we cannot see how Brooks could have been prejudiced by this conversation as it occurred outside of the presence of the jury.

[4] Brooks also argues that by mentioning the first trial, the trial court violated its order on his oral motion in limine. During a conference prior to the beginning of Brooks's murder trial, Brooks made an oral motion in limine. This motion concerned the testimony of two particular witnesses, neither of which was Detective Sandefur. In ruling on this motion, the trial court ordered that the two particular witnesses could not discuss the first trial or Brooks's convictions for auto theft. The trial court's order concerned only the two particular witnesses, and was not a general order relating to all other witnesses, the parties, or the court itself. Given the limited nature of the trial court's order, we cannot say that the trial court violated its prior order by inadvertently mentioning the first trial one time during Detective Sandefur's testimony at the murder trial.

*generally, Emmons v. State*, 542 N.E.2d 544, 545-46 (Ind. 1989) (finding that a passing reference to defendant's prior trial without any indication of the outcome of said trial did not give rise to error).

## B. Evidence Relating to Auto Theft

[14] The Indiana Supreme Court has held that a claim relating to admission of evidence at trial "that has been waived by a defendant's failure to raise a contemporaneous objection can be reviewed on appeal if the reviewing court determines that a fundamental error occurred." *Brown v. State*, 929 N.E.2d 204, 207 (Ind. 2010). In this case, Brooks concedes that he did not object to the admission of the challenged evidence at trial, instead arguing that admission of evidence relating to the theft of the two trucks constituted fundamental error. Specifically, Brooks claims that the evidence should not have been admitted because it was "evidence of prior bad acts pursuant to Ind. Evidence Rule 404(b)." Appellant's Br. pp. 16-17. Brooks also claims that the evidence should have been excluded because it was "more prejudicial to him than its probative value." Appellant's Br. p. 20.

[15] Indiana Evidence Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Ind. Evid. R. 404(b).

The rationale behind Rule 404(b) is that the jury is precluded from making the forbidden inference that the defendant had a criminal propensity and therefore engaged in the charged conduct. *Cowan v. State*, 783 N.E.2d 1270, 1275 (Ind. Ct. App. 2003). However, [the Indiana Supreme Court] has determined that Rule 404(b) does not bar the admission of evidence of uncharged criminal acts that are "intrinsic" to the charged offense. *Lee v. State*, 689 N.E.2d 435, 439 (Ind. 1997). "Intrinsic," in this context, refers to those offenses occurring at the same time and under the same circumstances as the crimes charged. *Cowan*, 783 N.E.2d at 1275; *cf. United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) ("When the other crimes or wrongs occurred at different times and under different circumstances from the offense charged, the deeds are termed 'extrinsic.'") Evidence of such conduct is admissible because it does not concern "other" crimes, wrongs, or acts, and it is not offered for the purpose of creating an inference as to the accused's character or propensity. *See* Evid. R. 404(b); *Lee*, 689 N.E.2d at 439; *Weyls v. State*, 598 N.E.2d 610, 613-14 (Ind. Ct. App. 1992), *trans. denied*. Notably, acts by persons other than the defendant may be relevant and admissible as intrinsic acts. *Blankenship v. State*, 462 N.E.2d 1311, 1313 (Ind. 1984).

*Kyle v. State*, 54 N.E.3d 439, 444 (Ind. Ct. App. 2016). "'Evidence of happenings near in time and place that complete the story of the crime is admissible even if it tends to establish the commission of other crimes not included among those being prosecuted.'" *Wages v. State*, 863 N.E.2d 408, 411 (Ind. Ct. App. 2007) (quoting *Bocko v. State*, 769 N.E.2d 658, 664-65 (Ind. Ct. App. 2002), *trans. denied*). Admissibility of all intrinsic evidence depends solely on the balance between the probative value of the evidence and the risk of unfair prejudice. *Kyle*, 54 N.E.3d at 444 (citing *Ware v. State*, 816 N.E.2d 1167, 1175 (Ind. Ct. App. 2004)).

[16] Review of the record demonstrates that the challenged evidence was presented to show that Brooks and his accomplice, Mays, fled the scene of the murder by stealing two trucks. The thefts and resulting flight occurred soon after the murder. The thefts also occurred within a few miles of each other and the murder scene. Law enforcement officials subsequently encountered Brooks and Mays in Corydon near the scene where one of the stolen trucks had been driven off the road and into a ravine where it struck a tree. Upon review, we conclude that the theft of the trucks was intrinsic to the murder as it completed the story of how Brooks and Mays got from the scene of the murder to Corydon. Their flight from the murder scene was also relevant to show consciousness of guilt. *See Myers v. State*, 27 N.E.3d 1069, 1077 (Ind. 2015) (providing that evidence of flight may be considered as circumstantial evidence of consciousness of guilt). The challenged evidence was not offered as evidence of Brooks's character or propensity but was necessary to complete the story of the crime, namely how Brooks got from the spot of the murder to Corydon. Thus, the challenged evidence was admissible under Indiana Evidence Rule 404(b).

[17] We have held that "[e]ven if relevant under 404(b), the evidence may nevertheless be excluded if its probative value is substantially outweighed by its prejudicial effect." *Cadiz v. State*, 683 N.E.2d 597, 600 (Ind. Ct. App. 1997) (citing Evid. R. 403; *Forrest v. State*, 655 N.E.2d 584, 587 (Ind. Ct. App. 1995), *trans. denied*). Indiana Evidence Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues,

misleading the jury, undue delay, or needlessly presenting cumulative evidence." The Indiana Supreme Court has held that "[t]rial courts are given wide latitude in weighing probative value against the danger of unfair prejudice, and we review that determination for abuse of discretion." *Houston v. State*, 730 N.E.2d 1247, 1251 (Ind. 2000).

> We acknowledge the potential for prejudice, however our inquiry is not whether the evidence is prejudicial. Rather, the inquiry is whether the evidence is unfairly prejudicial since all relevant evidence in a criminal proceeding is inherently prejudicial. *Richmond v. State*, 685 N.E.2d 54, 55 (Ind. 1997); [*Cadiz*, 683 N.E.2d at 600].

*Giles v. State*, 699 N.E.2d 294, 300 (Ind. Ct. App. 1998). As such, in considering whether admission of the challenged evidence amounted to fundamental error, we must next consider whether the probative value of the evidence outweighed the risk that its admission would cause unfair prejudice to Brooks.

[18] In arguing that the risk of prejudice outweighed the probative value of the challenged evidence, Brooks claims that the challenged evidence was not probative because Mays testified that they had not stolen the trucks as a means to escape Jennings County but rather that in taking the trucks, they were merely "joy riding" and "goofing around." Tr. p. 1482. However, the jury was under no obligation to believe Mays's explanation for why he and Brooks stole the trucks. *See Roberson v. State*, 430 N.E.2d 1173, 1175 (Ind. 1982) (providing that it "is the prerogative of the trier of fact to believe the witnesses or disbelieve them, and to disregard the testimony of a witness they do not believe").

Further, with respect to the challenged evidence, the trial court gave the following limiting instruction to the jury:

> Evidence regarding the Defendant's involvement in the theft of two (2) motor vehicles is to be considered by you only for the purpose of identifying the Defendant and to show his actions at or near the time of the events in this case, and you are to consider it only for that purpose.

Tr. p. 1650. Nothing in the record indicates that the jury disregarded the trial court's instruction.

[19] Upon review, we conclude that Brooks has failed to prove that the probative value of the challenged evidence was unfairly prejudicial. We therefore further conclude that Brooks has failed to establish error, much less fundamental error, with regard to the admission of the challenged evidence at trial.

## C. Testimony of Probation Officer

[20] Brooks last challenges the trial court's decision to allow his probation officer to testify about a conversation which Brooks had engaged her in while housed in the Jennings County Jail prior to the murder trial. Brooks again concedes that he did not object to the admission of his probation officer's testimony at trial, instead arguing that admission of this evidence constituted fundamental error. In raising this argument, Brooks claims that his probation officer's testimony should not have been admitted because it was unfairly prejudicial.

[21] During trial, the deputy prosecuting attorney asked Chasity Gerkin, a Jennings County probation officer, whether she spoke with Brooks at the Jennings

County Jail in early-November of 2014. Gerkin responded that although she wasn't there to see Brooks, she did see him at Brooks's request. Gerkin indicated that during this encounter, she did not interview Brooks or attempt to speak to him about the underlying criminal case. Gerkin's testimony continued as follows:

> [State]: Ms. Gerkin can you tell the Court the content of that conversation you had with Mr. Brooks in November of last year?
> [Witness]: [Brooks] asked to speak to me regarding just my knowledge of his probation status, so we were talking and he wanted to get his time started. He advised me, he would be going away for a long time…
> [State]: Let me stop you for a second, he was, was he talking about his pending criminal charges, the theft, murder and robbery?
> [Witness]: All in one, that was what he would be going away for a long time for is what he told me.
> [State]: Was that your understanding of what he meant?
> [Witness]: Yes.
> [State]: Okay what else did he go on to tell you?
> [Witness]: That basically, at that point in time he was aggravated. He was upset because he was stating that the co-defendant in this case was trying to pin everything on him, they were equal participants, he did it too, he had just as much in it as [Brooks] did, so he was upset that the co-defendant was lying. [Brooks] made the statement that basically he wasn't a liar, he had already said what he did and he was just ready to get this going, get the time started and be done with it all.
> [State]: Okay so he said we both participated in it. Do you mean, when he said both, Jovonnie Mays?
> [Witness]: Yes.
> [State]: And Jody Brooks?
> [Witness]: Yes.

> [State]:      Did he tell you anything else?
> [Witness]:    We were talking about, basically I had come to, I just asked him why I mean, and he said he had been drinking, so basically you're a mean drunk, and he said yes.
> [State]:      Did he say what type of alcohol causes him to be a mean drunk or anything?
> [Witness]:    It was the hardened liquor, vodka specifically is what he had stated that … just made him mean.

Tr. pp. 1382-84 (first ellipsis in original, second ellipsis added). On cross examination, defense counsel attempted to call Gerkin's credibility into question by asking her about her friendship with the deputy prosecutor's wife and the fact that she had known the deputy prosecutor "for years." Tr. 1385. Defense counsel also questioned Gerkin as follows:

> [Defense Counsel]: Okay so you're saying that [Brooks] was worried that [Mays] was throwing him under the bus?
> [Witness]:          He was angry.
> [Defense Counsel]: An innocent person would be mad if someone was trying to throw them under the bus correct?
> [Witness]:          Correct.
> [Defense Counsel]: Would a guilty person be worried about something like that?
> [Witness]:          I would think so too.

Tr. p. 1385.

[22]    The admissibility of a defendant's statement or confession "is controlled by determining, from the totality of the circumstances, whether it was made voluntarily and not through inducement, violence, threats, or other improper influences so as to overcome the free will of the accused." *Pasco v. State*, 563

N.E.2d 587, 591 (Ind. 1990) (citing *Lyons v. State*, 506 N.E.2d 813, 816 (Ind. 1987)). In the instant matter, the record reflects that in engaging in the above-discussed conversation, Gerkin did not seek Brooks out, but rather that Brooks sought Gerkin out. The record further reflects that Brooks was acting voluntarily and of his own accord when he made the above-quoted statements to Gerkin. As such, the totality of the circumstances indicate that Brooks's statement to Gerkin was admissible as it was made voluntarily and not through inducement, violence, threats, or other improper influences.

[23] Further, we disagree with Brooks's claim that Gerkin's testimony regarding his voluntary statement to her was unfairly prejudicial because it indicated that he was on probation for some other criminal acts and was vague as to what crimes he was admitting to have committed. While Brooks's statement to Gerkin was undoubtedly prejudicial, it was not unfairly prejudicial. Again, Brooks made the statement to Gerkin voluntarily and of his own accord. In addition, Gerkin's testimony was clear that she understood Brooks to have been admitting to involvement in the thefts of the trucks, the robbery, and the murder. Brooks's counsel did not object to this testimony, but rather attempted to raise questions as to Gerkin's credibility on cross-examination. Further, while Gerkin's testimony did indicate that Brooks questioned her about his probation status, Gerkin provided no testimony regarding whether Brooks was actually on probation at the time Brooks engaged her in the above-discussed conversation. Brooks has failed to demonstrate that the trial court erred by

allowing Gerkin to testify, much less that the trial court's decision in this regard constituted fundamental error.

## D. Cumulative Effect

Brooks alternatively argues that "should this Court rule that no one error reached the level of fundamental error, Mr. Brooks argues that the combination of all the errors reached the level of fundamental error and Mr. Brooks's conviction should be reversed and the matter remanded to the trial court." Appellant's Br. p. 22. We disagree. The Indiana Supreme Court has held that a defendant "is not entitled to a perfect trial, but is entitled to a fair trial, free of errors so egregious that they, in all probability, caused the conviction." *Averhart v. State*, 614 N.E.2d 924, 929 (Ind. 1993). Brooks has failed to prove that the cumulative effect of the alleged errors was so egregious that it made a fair trial impossible or "caused" his convictions.

## II. Admission and Exclusion of Evidence

Brooks also contends that the trial court abused its discretion in excluding certain evidence from trial and admitting other evidence at trial.

> The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Farris v. State*, 818 N.E.2d 63, 67 (Ind. Ct. App. 2004). We will reverse a trial court's decision only for an abuse of discretion. *Id.* We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Taylor v. State*, 891 N.E.2d 155, 158 (Ind. Ct. App. 2008). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the

court or it misinterprets the law. *Id.* In determining whether an error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury. *Oldham v. State*, 779 N.E.2d 1162, 1170 (Ind. Ct. App. 2002). Admission of evidence is harmless and is not grounds for reversal where the evidence is merely cumulative of other evidence admitted. *Pavey v. State*, 764 N.E.2d 692, 703 (Ind. Ct. App. 2002).

*Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). "Moreover, the trial court's ruling will be upheld if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory." *Rush v. State*, 881 N.E.2d 46, 50 (Ind. Ct. App. 2008) (citing *Gonser v. State*, 843 N.E.2d 947, 950 (Ind. Ct. App. 2006)).

## A. Exclusion of Certain Evidence

[26] Brooks claims that the trial court abused its discretion in excluding certain evidence which the trial court determined to be inadmissible hearsay. In making this claim, Brooks argues that the challenged testimony should have been admitted because it fell under the excited utterance exception to the hearsay rule. For its part, the State claims that the trial court did not abuse its discretion in excluding the challenged evidence because the evidence in question amounted to inadmissible hearsay.

[27] "Hearsay is an out of court statement offered to prove the truth of the facts asserted in the statement itself." *Williams v. State*, 782 N.E.2d 1039, 1045 (Ind. Ct. App. 2003) (citing Ind. Evidence Rule 801(c)). "Hearsay is generally

inadmissible unless the statement falls within one of the established hearsay exceptions." *Id*. (citing Ind. Evid. R. 802). In the present case, Brooks argued that the challenged statements were admissible under the excited utterance exception.

[28]     For a hearsay statement to be admitted as an excited utterance under Evidence Rule 803(2), three elements must be shown: (1) a startling event occurs; (2) a statement was made by a declarant while under the stress of excitement caused by the event; and (3) the statement relates to the event. Ind. Evid. R. 803(2). Application of these elements is not mechanical. Rather, the inquiry turns on whether the statement is inherently reliable because the declarant was under the stress of the event and unlikely to make deliberate falsifications. *Cox v. State*, 774 N.E.2d 1025, 1027 (Ind. Ct. App. 2002) (citing *Jenkins v. State*, 725 N.E.2d 66, 68 (Ind. 2000)). The time period between the startling event and the statement is but one factor to consider when determining if a statement is an excited utterance, but no precise length of time is required. *Id*. (citing *Simmons v. State*, 760 N.E.2d 1154, 1161 (Ind. Ct. App. 2002)).

*Id*. at 1045-46.

[29] Brooks called Matt Gosman to testify at trial about an interaction he had with Austin Woodson during the late-morning or early-afternoon hours on October 17, 2014. The State objected when Brooks attempted to illicit statements allegedly made by Woodson from Gosman, arguing that any statement made by Woodson was hearsay. Brooks argued that Woodson's statements qualified as excited utterances, and therefore should be admitted. The trial court disagreed and sustained the State's objection. Brooks did not make an offer of

proof at this time regarding the alleged contents of Woodson's statement to Gosman. Any claim of error in this regard is therefore waived. *See Carter v. State*, 932 N.E.2d 1284, 1287 (Ind. Ct. App. 2010) (providing that a claim that a trial court abused its discretion by excluding evidence is waived if the party wishing to have the evidence admitted fails to make an offer to prove).

[30] Gosman also testified that he was interviewed by State Police Officer Roger Drew regarding his observation of and conversation with Woodson. Brooks then attempted to introduce a video recording of Officer Roger Drew's interview with Gosman. In a hearing outside of the presence of the jury, the State objected to admission of the recording, arguing that Gosman's statements regarding any statement made by Woodson was hearsay. Brooks again claimed that Woodson's statements qualified as excited utterances. The hearing outside the presence of the jury continued with the trial court engaging the parties in the following exchange:

> [Trial Court]: The only exception that I can see it would come under would be excited utterance, and I don't think it meets the requirements for that. Anything else?
> [Defense Counsel]: No your Honor.
> [Trial Court]: Do you wish to make an offer or [sic] proof on the issue? I think I know what it is already, but for the record we probably should get that it in.
> [Defense Counsel]: Yes I do your Honor. I offer to prove that Austin Woodson would, of course we can go back to the last record of the last trial where it says…
> [Trial Court]: But I think we should make it in this trial.
> [Defense Counsel]: Right but I'm just saying that's what

he's going to say, we just saw a guy get killed.

[Trial Court]:          Do you wish to add to that [Deputy Prosecutor]?

[Deputy Prosecutor]:    No I'm not sure that was his exact statement or even that was in fact it, but …

[Defense Counsel]:      That was close to it.

[Trial Court]:          The objection is sustained[.]

Tr. pp. 1580-81.

[31]    In arguing that Woodson's comments qualified as an excited utterance, Brooks claimed that Woodson's statements were "extremely important" and to not admit them would be "highly prejudicial" because they called into question the timeline for the murder that was presented by the State. Tr. pp. 1578, 1579. Gosman indicated that at the time Woodson made the statements in question, he was acting "[r]eal strange" and that Woodson and the other two individuals with him appeared to be "nervous or scared." Tr. p. 1572, 1576. Again, for a hearsay statement to be admitted as an excited utterance under Evidence Rule 803(2), three elements must be shown: (1) a startling event occurs; (2) a statement was made by a declarant while under the stress of excitement caused by the event; and (3) the statement relates to the event. Ind. Evid. R. 803(2). The fact that Woodson was acting strange and appeared to be nervous or scared, without more, is not sufficient to meet the requirements of Evidence Rule 803(2). Further, when pressed on the strange nature of Woodson's behavior, Gosman indicated that he saw that while Woodson and two other men gathered around a piece of park equipment, one of the men took off his shirt, put a clean shirt on, and placed the other shirt into a duffle bag. On cross-

examination, Gosman admitted that he "had heard" that Woodson was homeless or a transient who moved around a great deal and acknowledged that it would seem likely that "someone such as that" would carry a duffle bag with him with his belongings. Tr. p. 1575.

[32] The trial court determined that Brooks had failed to establish that Woodson's alleged statement constituted an excited utterance. Brooks has failed to prove on appeal that the trial court abused its discretion in reaching this determination. As such, we conclude that the trial court did not abuse its discretion in excluding Gosman's testimony relating to the contents of the statements that Woodson allegedly made.

## B. Admission of Certain Evidence

[33] For a second time, under a different theory than was argued above, Brooks challenges the admission of Gerkin's testimony. Specifically, Brooks argues that the trial court abused its discretion in admitting Gerkin's testimony regarding the conversation she had with Brooks in the Jennings County Jail in November of 2014. In making this argument, Brooks claims that his comments to Gerkin were made during a custodial interview that Gerkin conducted for the purpose of completing a pre-sentence investigation report ("PSI report") and because the matter had yet to reach the sentencing phase with respect to all of the charges relating to the murder, robbery, and auto theft, Gerkin should have read him his *Miranda* rights before interviewing him. For its part, the State argues that Brooks's comments were admissible as the comments were not made during a custodial interview but rather were voluntarily made by Brooks.

[34] Initially, we observe that despite Brooks's claim to the contrary, the record clearly demonstrates that on the date in question, Gerkin was not at the Jennings County Jail for the purpose of interviewing Brooks in connection to the creation of a PSI report. Gerkin explicitly testified that she was not at the Jennings County Jail on the date in question for the purpose of speaking with Brooks and that she only spoke to Brooks at Brooks's request. Gerkin further testified that during her encounter with Brooks, she did not interview Brooks or attempt to speak to him about the underlying criminal case. Brooks has failed to point to anything in the record, apart from his own self-serving arguments, which would suggest that Gerkin's testimony in this regard was not accurate. The trial court acted well within its discretion when it credited Gerkin's testimony over Brooks's self-serving arguments and allowed Gerkin to testify. *See generally Black v. State*, 256 Ind. 487, 490, 269 N.E.2d 870, 872 (1971) (providing that because only a trial court sees the witnesses on the stand, their demeanor in testifying, their candor, or lack of candor, in disclosing facts about which they have knowledge, juries and trial courts are in the best position to determine which witnesses to believe).

[35] Further, we reject Brooks's claim that Gerkin should have read him his *Miranda* rights before he gave the statement in question. With respect to the requirement to give *Miranda* warnings, we have previously held that "[r]ights under *Miranda* apply only to custodial interrogation." *Richardson v. State*, 794 N.E.2d 506, 512 (Ind. Ct. App. 2003) (citing *White v. State*, 772 N.E.2d 408, 412 (Ind. 2002)). "[U]nder *Miranda*, 'interrogation' includes express questioning and words or

actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect." *Id*. (citing *White*, 772 N.E.2d at 412). "Volunteered statements do not amount to interrogation." *Id*. (citing *White*, 772 N.E.2d at 412).

[36] It is undisputed that Brooks was incarcerated at the time he made the statement at issue. However, the record clearly demonstrates that his statement to Gerkin was voluntary. Thus, the statement at issue was not obtained through interrogation and was admissible. *See id.*; *see also White*, 772 N.E.2d at 412.

# III. Appropriateness of Sentence

[37] Brooks also contends that his aggregate sixty-two-year sentence is inappropriate. In challenging the appropriateness of his sentence, Brooks asserts that he "believes that 60 years for the murder is excessive." Appellant's Br. p. 33. We disagree.

[38] Indiana Appellate Rule 7(B) provides that "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In analyzing such claims, we "'concentrate less on comparing the facts of [the case at issue] to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it reveals about the defendant's character.'" *Paul v. State*, 888 N.E.2d 818, 825 (Ind. Ct. App. 2008) (quoting *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002), *trans.*

*denied*). The defendant bears the burden of persuading us that his sentence is inappropriate. *Sanchez v. State*, 891 N.E.2d 174, 176 (Ind. Ct. App. 2008).

[39] With respect to the nature of Brooks's offenses, the record demonstrates that Brooks and Mays carried out an unprovoked attack on Smith, a helpless, drunken man. This attack resulted in Smith's death. Again, an autopsy later determined that Smith had suffered over fifty wounds, including, numerous cuts and bruises; long excoriations to his back that were consistent with dragging; bruising and hemorrhaging of Smith's brain; multiple fractures to his nose, face, and eye socket; a fractured left hyoid bone; two fractures in his neck; factures of the ribs in five areas together with a punctured lung; hemorrhaging to Smith's left testes; and a tear in Smith's aorta which was "absolutely lethal" and had been the immediate cause of his death. Tr. p. 1325.

[40] The evidence demonstrates that in carrying out this heinous attack, Brooks forcibly moved Smith from the common hallway of the apartment building to a spot used for garbage collection outside the building. Further, after committing the murder, Brooks and Mays stole and wrecked two vehicles, using the vehicles not only for flight but also to take "a joy ride." Tr. p. 1481. The men drove one of the vehicles through a soybean field and ran the other off of the road, wrecking it into a tree. The fact that Brooks was allegedly intoxicated at the time he committed these criminal acts does not excuse his behavior or lessen the heinous nature of his crimes. The record demonstrates that despite his alleged intoxication, Brooks was alert and coherent enough to control his

movements and to comply with the commands of others. He was described by one witness as looking as if he was "on a mission." Tr. p. 1055.

[41] With respect to Brooks's character, the record demonstrates that by the age of twenty-three, Brooks had already accumulated convictions for four misdemeanor offenses and one Class D felony offense. He had also been subject to three probation revocations. In addition, despite his claimed marketable skills, Brooks was unemployed when he murdered Smith. Brooks also admitted that he was a regular abuser of drugs and alcohol. In fact, Brooks further admitted that he had used both drugs and alcohol on the day of Smith's murder. Brooks was determined to be a high risk to reoffend and reported little concern for others. Further, while incarcerated in the Jennings County Jail pending sentencing, Brooks was cited for six rule violations, including a fight that began when Brooks "sucker punch[ed]" another inmate, damaging a sprinkler head, flooding the cells and daily room of the jail's 500 block, and flooding a sink or toilet. Tr. p. 1677. We agree with the State's assertion that Brooks's apparent disregard for authority, the laws of this state, and the rights of others speaks poorly of his character. We therefore conclude that Brooks has failed to prove that his sentence is inappropriate in light of the nature of his offenses and his character.

## IV. Advisement of Possible Release Dates

[42] Brooks last contends that the trial court erred by failing to advise him of his earliest and latest possible release dates from prison. Specifically, Brooks

argues that the trial court failed to comply with Indiana Code section 35-38-1-1(b), which provides: "When the court pronounces the sentence, the court shall advise the person that the person is sentenced for not less than the earliest release date and for not more than the maximum possible release date."

[43] We recently considered a similar claim in *Henriquez v. State*, 58 N.E.3d 942 (Ind. Ct. App. 2016). In *Henriquez*, we observed as follows:

> One way to interpret Section 35-38-1-1(b) would be to say that it requires the trial court to tell the defendant exactly what the provision says: "You are sentenced for not less than the earliest release date and for not more than the maximum possible release date." In fact, this is the sort of advisement the Indiana Criminal Benchbook recommends. *See* Ind. Crim. Benchbook § 68.25.000 (3d ed. 2001, supplemented through July 2014). However, such an advisement provides no meaningful information to the defendant and therefore serves no purpose. Thus, we presume that the legislature did not intend for the statute to be interpreted this way. *See* [*Gargano v. Lee Alan Bryant Health Care Facilities, Inc.*, 970 N.E.2d 696, 702 (Ind. Ct. App. 2012).]
>
> The only other plausible interpretation of the language is that the trial court is required to advise the defendant of specific potential release dates. However, it would be incredibly difficult, if not impossible, for a trial court to determine these dates with any certainty. The trial court would have to consider not only the term of the sentence but also the term of any other concurrent or consecutive sentence, credit time earned before sentencing, the maximum amount of credit time in the current credit class, possible educational credit time, and the possibility of parole and probation violations and revocations down the road. *See Hines v. State*, 856 N.E.2d 1275, 1284 n. 9 (Ind. Ct. App. 2006), *trans. denied*. At best, the trial court could provide an estimate. *Id*. But providing estimated rather than precise release dates may lead to

more confusion than clarity for the offender. Moreover, any mistake by the trial court would open the door to future collateral sentencing attacks.

58 N.E.3d at 943. We concluded that "[i]n any event, to the extent that the trial court "erred" by failing to provide specific dates, estimated or otherwise, Henriquez has not shown that he was harmed in any way by this omission" and that "[w]e will not reverse based on a harmless error." *Id*. at 944. Accordingly, we affirmed the judgment of the trial court. *Id*. We also took the "opportunity to encourage our legislature to reconsider Indiana Code section 35-38-1-1(b) and the unworkable obligation it places on our trial courts." *Id*.

[44]  Similarly, we conclude that to the extent that the trial court erred by failing to provide specific dates for Brooks's possible release from incarceration, any such error was harmless. As we stated in *Henriquez*, we will not reverse based on a harmless error. *Id*.

# Conclusion

[45]  In sum, we conclude that Brooks has failed to prove that the trial court committed fundamental error or abused its discretion. We also conclude that Brooks has failed to prove that his sentence was inappropriate in light of the nature of his offenses or his character. Finally, we conclude that any error in the trial court's failure to advise Brooks of specific possible release dates was, at most, harmless.

[46]  The judgment of the trial court is affirmed.

Pyle, J., and Altice, J., concur.